No. 101,041

STATE OF KANSAS, *Appellee*, v. CHERISH MCCULLOUGH, *Appellant*.

(270 P.3d 1142)

Opinion filed March 2, 2012.

*Richard Ney*, of Ney, Adams & Sylvester, of Wichita, argued the cause and was on the briefs for appellant.

*Boyd K. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Cherish M. McCullough and LaShonda Callaway got into a fistfight at a Wichita convenience store. After other store patrons broke up the fight, McCullough went to her car, returned with a knife, maneuvered around another person, and fatally stabbed Callaway in the abdomen. McCullough was convicted of premeditated first-degree murder. Our principal issue on appeal is whether the jury should have been instructed on self-defense. Under Kansas law, if McCullough willingly engaged in mutual combat she would not be entitled to claim self-defense unless she made a good-faith withdrawal and did everything within her power to avoid the killing. McCullough did not take either step. She reengaged in the conflict by returning to the store with a knife, and we hold she was not entitled to a self-defense instruction. We also reject the other issues raised on appeal and affirm her conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 23, 2007, Callaway, the victim, was inside a neighborhood convenience store when McCullough entered with her stepbrother and cousin. McCullough remained near the doorway, talking to her boyfriend on her cell phone. But as Callaway left, she walked past McCullough and they began fighting.

The convenience store had multiple cameras in the store and parking lot that recorded the fight and its aftermath. The videos were played at trial. They depict Callaway and McCullough shoving each other and engaging in what is fairly described as a fistfight. Some other customers intervened and separated the pair, and then one customer blocked the doorway, preventing Callaway from leaving, while McCullough's stepbrother escorted McCullough to her car. Then, the stepbrother returned to the store to retrieve the cousin.

Callaway appears on the video sporadically trying to push her way past the customer, while McCullough remained in the car. But after a short period, McCullough can be seen getting out of the car and walking back to the doorway, where her stepbrother and Callaway were yelling at each other. McCullough positioned herself behind her stepbrother, and also began yelling at Callaway over

her stepbrother's shoulder. Callaway had her fists up, when the stepbrother pushed her back. McCullough then lunged forward, reached around her stepbrother, and stabbed Callaway. The view of the stabbing itself is obstructed on the video, but McCullough can be seen stepping back as she held a knife up at around shoulder height while again speaking to Callaway. At this point, McCullough and her stepbrother ran out to the car and their cousin quickly followed. The video shows Callaway swaying for a few seconds before she grabs her abdomen and falls to the floor.

Callaway was taken to a hospital, where she died 6 hours later from the stab wound. The evidence showed her wound was about 4½ inches deep and almost reached the back inner wall of her torso. The victim's liver and kidney were damaged.

There is conflicting testimony about how the fight between McCullough and Callaway began, but evidence was admitted at trial that the women previously knew each other. There also was evidence that about 6 months before she was killed, Callaway was admitted to a psychiatric hospital for 9 days and then transferred to a state hospital by court order. While hospitalized, Callaway was diagnosed with bipolar affective disorder, which can result in depressed or manic episodes. Her hospital records indicated that she made several threats that she would kill members of her family and the hospital's staff while she was institutionalized.

The trial evidence indicated that McCullough had some knowledge of Callaway's condition because she was friends with Callaway's ex-boyfriend, Monty Alford, who testified he told McCullough that Callaway called him while institutionalized in the state hospital and that Callaway was "talkin' real off." Alford also testified that he told McCullough about an argument he and Callaway had when Callaway learned he was cheating on her. During that argument, he said, Callaway pulled a kitchen knife and cut Alford's hand as he grabbed it from her. Alford testified that he told McCullough to watch out for Callaway because she was "a little off" and kept a knife with her.

McCullough was charged with premeditated first-degree murder. The jury was instructed on first-degree premeditated murder, second-degree murder, and voluntary manslaughter. But the dis-

trict court denied McCullough's request for instructions on self-defense, reckless involuntary manslaughter, and involuntary manslaughter based on imperfect self-defense.

The jury convicted McCullough of first-degree premeditated murder. A motion for new trial was denied. That motion raised the same issues asserted on appeal, except for those identified below that are brought now for the first time. McCullough was sentenced to life imprisonment with a mandatory minimum of 25 years. She filed a timely notice of appeal. This court has jurisdiction under K.S.A. 22-3601(b)(1) (direct appeal for off-grid crime; life sentence).

## Issue 1: The Self-Defense Instruction

At trial, McCullough requested a self-defense instruction under a defense-of-self theory. The district court declined to issue that instruction on two grounds. First, the court found that McCullough and Callaway had engaged in mutual combat and McCullough did not use all available means to avoid killing Callaway. Second, the court held that a reasonable person in McCullough's position would not have believed deadly force was necessary. On appeal, McCullough continues to argue that she was entitled to a self-defense instruction but now asserts the self-defense instruction was also justified because she was acting in defense of others. We hold that McCullough was not entitled to a self-defense instruction under either theory of self-defense. McCullough engaged in mutual combat and did not withdraw in good faith or utilize all available means to avoid the killing.

### Standard of Review

Generally, a defendant is entitled to instructions on the law applicable to his or her defense theory if there is sufficient evidence for a rational factfinder to find for the defendant on that theory. We view the evidence as to McCullough's claim that she was entitled to a self-defense instruction under a defense-of-self theory in a light most favorable to the defendant. See *State v. Anderson,* 287 Kan. 325, 331, 197 P.3d 409 (2008) (quoting *State v. Oliver,* 280 Kan. 681, 706, 124 P.3d 493 [2005], *cert. denied* 547 U.S. 1183

[2006]); *Anderson*, 287 Kan. at 334 (stating clarified standard). This is because she requested this instruction at trial.

But a different standard applies to McCullough's newly asserted claim that a self-defense instruction should have been given under a defense-of-others theory. Appellate courts review a district court's failure to give an instruction for clear error when the complaining party did not request an instruction or object to its omission. See K.S.A. 22-3414(3); *State v. Brown*, 291 Kan. 646, 653-54, 244 P.3d 267 (2011). Instructions are clearly erroneous only if the reviewing court is convinced there is a real possibility the jury would have rendered a different verdict. 291 Kan. at 654 (quoting *State v. Marler*, 290 Kan. 119, 124, 223 P.3d 804 [2010]).

*McCullough was not entitled to a self-defense instruction*

The right to use deadly force in self-defense is codified at K.S.A. 21-3211, which states:

"(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

"(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person."

This presents a two-prong self-defense test. The first is subjective and requires a showing that McCullough sincerely and honestly believed it was necessary to kill to defend herself or others. The second prong is an objective standard and requires a showing that a reasonable person in McCullough's circumstances would have perceived the use of deadly force in self-defense as necessary. See *State v. Barnes*, 263 Kan. 249, 265-66, 948 P.2d 627 (1997). The parties dispute whether these prongs were satisfied, but the threshold question is whether self-defense can even be invoked.

The doctrine of self-defense cannot excuse a killing done when the defendant willingly engaged in mutual combat unless the defendant has withdrawn in good faith and done everything in the defendant's power to avert the necessity of the killing. 263 Kan. at

266. This rule does not destroy the right to self-defense in all mutual combat cases; but for self-defense to justify the killing, the defendant must be acting "solely for the protection of [the defendant's] own life, and not to inflict harm upon [the defendant's] adversary." *State v. Burgess*, 245 Kan. 481, 487, 781 P.2d 694 (1989) (quoting 40 Am. Jur. 2d, Homicide § 142).

This court has defined mutual combat as " '[o]ne into which both the parties enter willingly or voluntarily; it implies a common intent to fight, but not necessarily an exchange of blows.' " *State v. Coop*, 223 Kan. 302, 306, 573 P.2d 1017 (1978) (quoting Black's Law Dictionary 332-33 [Rev. 4th ed. 1968]). And this court has held that it does not matter who initiated the confrontation when both parties willingly engaged in it, stating:

"If the parties fought by mutual consent the circumstances of who committed the first act of violence was immaterial; and, so long as each combatant persisted in his original determination to vanquish his antagonist the aggressions were mutual. A resistance which has for its real object the securing of an opportunity to mangle the assailant is not legal self-defense." *McNeil v. Mullin*, 70 Kan. 634, 637, 79 P. 168 (1905).

It is clear from the video evidence that McCullough and Callaway engaged in mutual combat. Several witnesses testified it was mutual. And because McCullough returned to the store with a knife, the evidence does not support a finding that she withdrew in good faith and did everything in her power to avoid killing Callaway. In addition, McCullough was not entitled to the self-defense instruction because a reasonable person in her position would not have believed deadly force was necessary to defend herself or others. As the district court held, Callaway was attempting to continue a fistfight, and there was no evidence McCullough needed to exercise deadly force to prevent an imminent death or great bodily harm.

Having found that McCullough was not entitled to a self-defense instruction, two other claims must fail. First, she was not entitled to an involuntary manslaughter instruction based on a theory of imperfect self-defense. That theory requires the lawful exercise of self-defense, but with excessive force. K.S.A. 21-3404(c). And since McCullough was not lawfully engaged in self-defense, she was not

entitled to the involuntary manslaughter instruction. Second, evidence of threats Callaway made while hospitalized were properly excluded. McCullough claims this evidence was "integral to the self-defense theory," but we hold that argument is inapplicable under the facts of this case. These threats were not relevant to any material fact, as required by K.S.A. 60-401(b).

ISSUE 2: RECKLESS INVOLUNTARY MANSLAUGHTER INSTRUCTION

McCullough next argues the district court erred by refusing to instruct the jury on reckless involuntary manslaughter. The district court instructed the jury on the lesser included offenses of second-degree murder and voluntary manslaughter, but it refused to instruct the jury on involuntary manslaughter after finding the killing was not unintentional. We agree with the district court's result.

*Standard of Review*

A trial court has a duty to instruct the jury on any lesser included offense established by the evidence, regardless if that evidence is weak or inconclusive. But there is no duty to instruct on a lesser included offense if the jury could not reasonably convict the defendant of the lesser included offense based on the evidence presented. When reviewing a refusal to give a requested instruction, appellate courts must view the evidence in the light most favorable to the requesting party. See K.S.A. 22-3414(3); *State v. Moore*, 287 Kan. 121, 130, 194 P.3d 18 (2008).

*The evidence does not support a finding that the killing was unintentional*

Reckless involuntary manslaughter is an unintentional killing committed recklessly. K.S.A. 21-3404(a). A reckless killing is one done under circumstances showing a realization of the imminence of danger and a conscious disregard of that danger. *State v. Jones*, 287 Kan. 559, 572, 197 P.3d 815 (2008). The district court held that the evidence did not support finding the killing was unintentional because a person does not "bring a knife into the store and reengage in this altercation, rush past one of the people, [and] thrust the knife out into the body of the victim" unintentionally.

McCullough argues the district court erred because it failed to distinguish between an intentional stabbing and an intentional killing. She claims there is evidence supporting a finding that the killing was unintentional because she only stabbed Callaway once and the wound probably would not have been fatal if it were a few inches in another direction. In other words, McCullough contends that an intentional stabbing committed without regard for the consequences is reckless. She argues the district court erroneously followed *State v. Bailey*, 263 Kan. 685, 691, 952 P.2d 1289 (1998), *overruled on other grounds State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2007), in which this court held that the issue was whether the act, *i.e.*, the stabbing or shooting, was intentional.

In *Bailey*, the defendant shot the victim in the head. He claimed self-defense but also testified in his own defense that he shot with the intention of frightening the people in the room and "in the process I guess I hit him." This court held that a "defendant's actions in pointing a gun at someone and pulling the trigger are intentional rather than reckless even if the defendant did not intend to kill the victim." 263 Kan. at 691. Based on this, the court reasoned, the defendant was not entitled to a reckless involuntary manslaughter instruction. 263 Kan. at 691.

But McCullough correctly notes that this court has reached the opposite conclusion and held that the issue is whether the killing was intentional, not whether the shooting was intentional, in *State v. Gregory*, 218 Kan. 180, 542 P.2d 1051 (1975). See also *State v. Childers*, 217 Kan. 410, 416, 536 P.2d 1349 (1975) (involuntary manslaughter is a killing done unintentionally, not an unintentional act). In *Gregory*, the defendant was charged with second-degree murder and convicted of involuntary manslaughter after he shot and killed the victim outside a bar. The defendant testified in his own defense that the victim approached him with a knife, threatening to kill him, and he was afraid. The defendant reacted by retreating to the bar's door and fired one shot after he discovered he could not open the door. He testified that he was " 'trying to stop' " the victim. 218 Kan. at 181. The *Gregory* court held that "there is no question that [the defendant] intentionally shot [the victim], but the jury might well have believed he did not intend to

kill him but only, in his words, 'to stop him.' It was [the defendant] who first suggested calling the police and an ambulance, further negating an intent to kill." 218 Kan. at 184.

McCullough is correct that the focus of the inquiry is whether the killing was intentional. And the district court erred by relying on *Bailey* for its conclusion. See *State v. Deal*, 293 Kan. 872, 269 P.3d 1282 (2012). But that does not resolve the issue because the test for whether an instruction should be issued has always depended upon the evidence in the particular case under consideration. *State v. Bell*, 266 Kan. 896, 906, 975 P.2d 239, *cert. denied* 528 U.S. 905 (1999). This means our inquiry must be whether there is evidence to support a finding that the killing was unintentional. *Gregory* is clearly distinguishable because there was some evidence supporting a finding that the defendant was behaving in a "wanton" manner, as required by the involuntary manslaughter statute that existed at that time. Gregory testified he did not intend to kill the defendant and there was additional evidence to corroborate that statement. There is no such evidence here.

The facts in McCullough's case are more analogous to *State v. Calderon*, 270 Kan. 241, 13 P.3d 871 (2000). In *Calderon*, the defendant stabbed and killed Francisco Munoz in a parking lot. Calderon and Munoz had a history of animosity. The night Munoz was killed, he approached Calderon with three friends and threatened to hit him. Calderon drew a knife and stabbed him in the abdomen, severing the aorta and causing Munoz to bleed to death. Calderon fled the scene. During the police investigation, Calderon stated that he had attempted to cut Munoz on the arm. On appeal, this court held that the district court was not required to instruct on reckless involuntary manslaughter because there was overwhelming evidence of intent and no evidence of recklessness. In doing so, this court disregarded Calderon's "self-serving statement regarding his lack of intent" finding that it was insufficient to justify the instruction. 270 Kan. at 256.

But there is no evidence in McCullough's case—even in the form of a statement from the defendant about her purpose in stabbing the victim—to support a finding that the killing of Callaway was unintentional. The facts simply are that after leaving the phys-

ical altercation in the convenience store that McCullough immediately returned to the store with a knife, reached around another person to be within close range to the victim, and fatally stabbed Callaway in the abdomen. McCullough offered no evidence to support a claim that the victim's resulting death was unintentional. The district court did not err by refusing to issue a reckless involuntary manslaughter instruction.

## Issue 3: The Motion for a Mistrial

Next, McCullough argues the district court improperly denied her motion for mistrial because the State improperly elicited bad character evidence from McCullough's cousin in violation of K.S.A. 60-447(b) (evidence of a trait of an accused's character tending to prove guilt or innocence). McCullough argues this evidence was inadmissible because she had not put her good character in question. But the State argues that, even if the question was improper, McCullough is not entitled to a new trial because the district court mitigated the incident's impact by admonishing the jury to ignore the State's question, rendering any error harmless.

*Standard of Review*

Under K.S.A. 22-3423(1)(c) a trial court may declare a mistrial if there was prejudicial conduct either inside or outside the courtroom that makes it impossible for the trial to proceed without injustice to either the defendant or the prosecution. This statute creates a two-step process. First, the trial court must determine if there was some fundamental failure of the proceeding. If so, the trial court moves to the second step and assesses whether it is possible to continue without injustice. In other words, the trial court must decide if the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011); see *State v. Race*, 293 Kan. 69, 80, 259 P.3d 707, 715 (2011).

Appellate courts review a district court's ruling on a motion for mistrial for an abuse of discretion. Judicial discretion is abused if

"judicial action: (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *Ward*, 292 Kan. at 550. In *Ward*, our court articulated this standard by dividing the appellate court's abuse of discretion inquiry into two parts: (1) Did the trial court abuse its discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the trial court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice? 292 Kan. at 551.

The analysis of the first question varies with the nature of the alleged misconduct, such as when the allegation is based on the actions of a witness, the actions of a bystander, prosecutorial misconduct, or evidentiary error. 292 Kan. at 551. Appellate courts reviewing the second part for an injustice may take a broader view than the trial court because appellate courts may examine the entire record. The degree of certainty required to conclude an injustice did not occur varies depending on whether the fundamental failure infringes on a constitutional right or not. To declare a nonconstitutional error harmless the appellate court must apply K.S.A. 60-261 and K.S.A. 60-2105 to determine if there is a reasonable probability that the error will or did affect the trial's outcome. And if the fundamental failure infringes on a right guaranteed by the United States Constitution, the appellate court applies the constitutional harmless error analysis defined in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). *Ward*, 292 Kan. at 570.

This case involves a violation of evidentiary limitations proscribed in K.S.A. 60-447, not a constitutional right. Thus, we apply the statutory harmless error standard from K.S.A. 60-261, which disregards errors that do not affect the substantial rights of the parties, to determine if there is a "reasonable probability that error will or did affect the outcome of the trial in light of the entire

record." 292 Kan. at 569. And since this is our first case post-*Ward* involving a statutory error, we must also determine who bears the burden of persuasion as to whether the error was harmless.

Our caselaw has long held, with the recent exception set out in *Ward* and its progeny concerning errors of a constitutional nature, that the party alleging an error based on a statute dealing with admission of evidence, bears the burden of proving his or her substantial rights to a fair trial were prejudiced by that statutory error. See *State v. White*, 284 Kan. 333, 342-43, 161 P.3d 208 (2007). But if we adhere to this general rule post-*Ward*, we create potential for confusion. For example, if in a particular case we found a mixture of constitutional and statutory errors, we could have the prosecution bearing the burden of showing harmlessness from the constitutional errors, while that burden remained on the defendant who alleged statutory errors were found—even when one party in that case benefitted from all of those errors. And in cases involving a cumulative error analysis, where all errors must be aggregated to determine their cumulative effect and interrelationship, it would seem unnecessarily cumbersome to divide the burden of proving harmlessness among the parties. See *State v. Tully*, 293 Kan. 176, 205-07, 262 P.3d 314 (2011) (cumulative error analysis in which errors being aggregated included those that were constitutional in nature).

This possibility prompts us to revisit our caselaw that a party seeking reversal of a judgment because of exclusion or admission of evidence bears the burden of demonstrating both error and prejudice. And having done so, we ascertain little in the way of rationale to justify continuation of the general rule. In one early civil case, our court simply declared without citation to any authority that "[i]t is elemental that one seeking reversal of a judgment because of exclusion of evidence has the burden of demonstrating error, as well as prejudice, in the ruling complained of." *Osborn v. Lesser*, 201 Kan. 45, 47, 439 P.2d 395 (1968). In criminal cases, this assumption as to the "elemental" nature of the rule was similarly followed, but again without a stated legal basis. See, *e.g.*, *State v. Lee*, 201 Kan. 177, 179, 440 P.2d 562 (1968) ("[o]ne seeking reversal of judgment because of erroneous exclusion of evidence has

the burden of demonstrating prejudice, as well as error"); *State v. Johnson*, 201 Kan. 126, 132, 439 P.2d 86 (1968) ("this court has always been committed to the rule that one seeking reversal of a judgment because of erroneous exclusion of evidence has the burden of demonstrating prejudice, as well as error"); *State v. Omo*, 199 Kan. 167, 173, 428 P.2d 768 (1967) (defendant has burden to demonstrate prejudicial error from joinder).

As this court noted in *Ward,* recent United States Supreme Court decisions have led us to conclude that the better practice is to apply the federal constitutional harmless error standard such that the party benefitting from the error must prove beyond a reasonable doubt that the error complained of did not affect substantial rights, meaning it did not contribute to the verdict obtained. *Ward,* 292 Kan. at 568-69. Given this, we similarly hold that it is the better practice for the party benefiting from the error to have the burden of showing a lack of prejudice when a violation of K.S.A. 60-447, *i.e.,* a nonconstitutional error, is in dispute. Therefore, we hold in McCullough's case that the State, as the party that arguably would benefit from an improper admission of evidence under the statute, carries the burden to show there is no reasonable probability that such error affected the outcome of the trial in light of the entire record.

*The trial court properly denied the motion for mistrial*

Turning to the facts in this case, the exchange at issue occurred during the State's examination of McCullough's cousin. The State asked what her cousin thought about seeing McCullough fighting. Defense counsel objected, and the objection was overruled. Her cousin stated that he did not know. The State then asked, "Did you tell the police that this was a normal thing for her?" Defense counsel objected again, but McCullough's cousin stated, "No ma'am" before the district court sustained the objection. McCullough immediately moved for a mistrial on the grounds that the State had improperly put her bad character in issue. The district court denied the motion, but it admonished the jury to disregard the question and answer.

McCullough argues the error from the improper question was incurable because the suggestion that she fought frequently was highly inflammatory. She also argues the jury would assume she has a violent predisposition for fighting, despite her cousin's denial that he told the police it was a normal occurrence, because the jury would assume the State would only ask the question if it could prove it.

We agree the question about what the cousin may have told police was improper and worded in such a way as to violate K.S.A. 60-447(b). The district court appropriately sustained the objection and sought to cure any residual implication by advising the jury to disregard both the question and the answer. But based on our review of the entire record, we do not find the exchange significant enough to believe there was any reasonable probability this inappropriate question affected the trial's outcome. This is particularly true when McCullough had the benefit of the trial court's jury admonition to disregard the improper question and the cousin's response, which contradicted the State's premise for the inquiry. We find the district court did not abuse its discretion by denying McCullough's motion for mistrial.

Finally, we note that in her reply brief McCullough for the first time characterized the prosecutor's improper question as prosecutorial misconduct. In *State v. Inkelaar*, 293 Kan. 414, 428, 264 P.3d 81 (2011), this court held that a defendant may raise a prosecutorial misconduct issue based on a prosecutor's improper question for the first time on appeal if the defendant properly lodged the evidentiary objection required by K.S.A. 60-404. In other words, the prosecutorial misconduct claim is sufficiently preserved if the defendant made the evidentiary objections that serve as the basis for the prosecutorial misconduct argument. But *Inkelaar* is distinguishable because McCullough did not raise this issue at the first opportunity in her appellate brief. Instead, McCullough improperly raised it in her reply brief. Kansas Supreme Court Rule 6.05 (2011 Kan. Ct. R. Annot. 45) provides that a reply brief is reserved for responding to new material contained in the appellee's brief. An appellant may not raise new issues in a reply brief. *City of Wichita v. McDonald's Corp.*, 266 Kan. 708, 724, 971 P.2d 1189

(1999) ("A reply brief is an inappropriate vehicle for raising additional issues."). As such, this claim is not properly before the court.

## ISSUE 4: PROSECUTORIAL MISCONDUCT

McCullough raises four prosecutorial misconduct claims alleging misconduct during closing argument: (1) improperly stating that the evidence introduced to prove intent could also be considered to prove premeditation; (2) arguing facts not in evidence; (3) misstating the definition of premeditation; and (4) misstating the definition of killing in the heat of passion. We find error only with the prosecutor's definition of heat of passion, but it was harmless.

### Standard of Review

This court employs a two-step analysis when considering allegations of prosecutorial misconduct during closing argument. First, the court determines whether the prosecutor's statements exceed the wide latitude of language and manner afforded a prosecutor in making closing arguments. Second, the court determines whether the prosecutor's comments constitute plain error. This occurs when the statements are so gross and flagrant that they prejudiced the jury against the defendant and denied the defendant a fair trial. *Inkelaar*, 293 Kan. at 427; *State v. Decker*, 288 Kan. 306, 314, 202 P.3d 669 (2009).

The second step focuses on whether the misconduct was so prejudicial that it denied the defendant a fair trial. This requires a harmlessness inquiry. Three factors are considered: (1) whether the misconduct was so gross and flagrant it denied the accused a fair trial; (2) whether the remarks showed ill will by the prosecutor; and (3) whether the evidence against the defendant was of such a direct and overwhelming nature that the prosecutor's statements would not have much weight in the jurors' minds. No individual factor controls. *Inkelaar*, 293 Kan. at 427; *Decker*, 288 Kan. at 315. The harmless error analysis required under the third factor was recently modified in our *Inkelaar* and *Ward* opinions, which will be addressed in greater detail below. But we must first determine whether any alleged error amounts to prosecutorial misconduct.

*(1) The prosecutor did not err by stating the evidence establishing intent proved premeditation*

McCullough contends first that the prosecutor committed misconduct by insinuating that evidentiary elements of premeditation and intent are the same and ignored the fact that premeditation requires a particular state of mind. She cites *State v. Abu-Fakher*, 274 Kan. 584, 610, 56 P.3d 166 (2002), in which this court held that an intentional killing does not by itself establish premeditation. But while McCullough recites a true statement of the law, it has no bearing on the prosecutor's actual comments in this case.

In her closing, the prosecutor argued that the video established Callaway's killing was intentional because the recording showed McCullough returning to her car; fiddling with something, which the prosecutor suggests was McCullough retrieving her knife; then walking back towards the store with the knife in her hand; and finally pushing her stepbrother out of the way so that she could stab Callaway. The prosecutor then stated "the same evidence" established premeditation. But the prosecutor clearly recognized that intent and premeditation are separate elements of the crime and simply argued those same facts could be used to establish both intent and the state of mind required for premeditation. We find this statement to be within the wide latitude afforded to prosecutors. McCullough's claim fails under the first prong of the analysis.

*(2) The prosecutor did not argue facts not in evidence*

McCullough next argues the following statement from the prosecutor's closing argued facts not in evidence:

"[W]hile she was in the car, and I believe on one of those videos, if you look from one of the cameras from inside the store outside into the parking lot, you can see her in the car fiddling, she's getting the knife, is a reasonable conclusion."

McCullough contends the evidence presented at trial established that she carried a pocketknife with her and there was no evidence establishing she returned to the car to get the knife. But McCullough's claim lacks merit because the prosecutor acknowledged the evidence she was referring to did nothing more than form the basis for a reasonable conclusion or inference that the knife was retrieved from the car just before the stabbing. In ad-

dition, McCullough agrees that the evidence showed only that she frequently carried the knife in her pocket, not that she had the knife in her pocket when the encounter with Callaway initially ensued. As such, the prosecutor's comments were directed at a point of evidentiary contention and do not fall outside the wide latitude of proper comment.

(3) *The prosecutor did not misstate the definition of premeditation*

McCullough next argues the prosecutor misstated the definition of premeditation. But McCullough's argument is predicated upon an isolated portion of the prosecutor's closing argument. The prosecutor began the statements at issue by reiterating the definition of premeditation, stating:

"[I]n order for you to find that [McCullough] is guilty of only second degree murder, you have to find that she didn't have premeditation, that she didn't think about it. And premeditation is defined to you as thinking about it, about the matter beforehand, form the design or intent to kill, more than instantaneous. There's no definition about how long it takes."

The district court had issued the following definition of premeditation from PIK Crim. 3d 56.04 in conjunction with the instruction on first-degree murder prior to the parties' closing arguments:

"Premeditation means to have thought over the matter beforehand, in other words, to have formed the design or intent to kill before the act. The concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

But McCullough premises her argument on the prosecutor's follow-up statement, which was an attempt to apply the law of premeditation to the facts of this case. The prosecutor stated:

"You know, we think of premeditation sometimes from the movies, where they sit at the kitchen table and say okay, we're gonna plan to do this, we're gonna plan to do that. The mere actions of arming yourself, of walking towards your target and then plunging that deadly weapon into her center makes it the premeditation."

Defense counsel objected to this, arguing the prosecutor misstated the law. The court overruled the objection and reminded the jury that arguments of counsel are not evidence and that the

court's definition of premeditation should guide its deliberations. Then the prosecutor said, "That is the definition of premeditation."

On appeal, McCullough contends the prosecutor's comments were analogous to stating premeditation can be instantaneous—language this court disapproved in *State v. Morton*, 277 Kan. 575, 585, 86 P.3d 535 (2004). But the record does not support this claim. It shows instead that the prosecutor accurately defined premeditation; explicitly stated that premeditation could not be instantaneous; and then indicated that the acts of getting a knife, walking back to Callaway, and stabbing her were sufficient to show premeditation. Those actions could not be performed in an instant; so McCullough's argument is without merit. As such, the prosecutor did not misstate the law, and this argument fails under the first prong of the misconduct analysis.

*(4) The prosecutor misstated the definition of killing in the heat of passion*

As her last point to the prosecutorial misconduct arguments, McCullough claims the prosecutor misstated the definition of heat of passion while discussing the voluntary manslaughter count. This count was one of the lesser included offenses available for the jury's consideration.

The district court instruction was from PIK Crim. 3d 56.05, which indicates that voluntary manslaughter occurs if the defendant intentionally killed the victim during a sudden quarrel, in the heat of passion, or upon an unreasonable but honest belief that circumstances existed that justify deadly force in defense of self. But the jury was not instructed on the definition of heat of passion, and neither party argues this omission was clear error. PIK Crim. 3d 56.04(e) defines heat of passion as:

"[A]ny intense or vehement emotional excitement which was spontaneously provoked from circumstances. Such emotional state of mind must be of such degree as would cause an ordinary person to act on impulse without reflection."

This court has frequently described "heat of passion" as meaning " 'any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, *anger*, hatred, furious resentment, fright, or terror,' based 'on impulse with-

out reflection.' " (Emphasis added.) *State v. Foster*, 290 Kan. 696, 711-12, 233 P.3d 265 (2010) (quoting *State v. Guebara*, 236 Kan. 791, 796, 696 P.2d 381 [1985]); see also *State v. Coop*, 223 Kan. 302, Syl. ¶ 1, 573 P.2d 1017 (1978); *State v. Jones*, 185 Kan. 235, Syl. ¶ 2, 341 P.2d 1042 (1959); *State v. Linville*, 148 Kan. 142, Syl. ¶ 2, 79 P.2d 869 (1938). In other words, this court often refers to anger as an example of what might be considered heat of passion, along with the other descriptors of the actor's emotional state.

But during closing argument the prosecutor made the following comments about heat of passion voluntary manslaughter. She stated, "Was it heat of passion? You know, heat of passion, we think of the case where, you know a woman finds her husband in bed with another woman." McCullough's counsel objected, arguing the prosecutor was trying to define heat of passion based on other types of cases. After the court overruled the objection and admonished the jury that a lawyer's arguments are not evidence, the following exchanged occurred.

"[Prosecutor]: So that's what we think of heat of passion, you know, finding your spouse in bed with another person. But you know what, *in this case anger isn't passion.*

"[McCullough's counsel]: Objection . . . the Court has defined what heat of passion is, heat of passion defines itself. Arguing that anger is not passion is objectionable.

"The Court: Well, its argument. Please continue.

"[Prosecutor]: *Anger is not the heat of passion, anger is a motive to kill.*" (Emphasis added.)

McCullough argues the emphasized language misstates Kansas law, citing this court's repeated definition of heat of passion. We agree. The prosecutor's statement was more than a simple fumble. It oversimplified the required analysis and denied that anger could even be an example of heat of passion under any circumstances, despite our caselaw to the contrary. For these reasons, the statement was misleading. Accordingly, we must determine whether this error was harmless under the standard adopted in *Inkelaar* and *Ward*.

*The prosecutor's misstatement of the heat of passion does not require reversal*

As noted above, this court considers three factors when determining whether misconduct prejudiced the jury and denied the defendant a fair trial. First, it considers whether the misconduct was gross and flagrant. To make this determination, the court considers whether the prosecutor repeated or emphasized the conduct. Second, we determine whether the misconduct suggests that the prosecutor acted with ill will. Like the first factor, ill will can be demonstrated if there was deliberate and repeated misconduct or an indifference to the court's rulings. Third, this court considers whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the jurors' minds. *Inkelaar*, 293 Kan. at 429.

This court has long held that the third factor cannot override the first two factors unless the harmless error tests of both K.S.A. 60-261 (inconsistent with substantial justice) and *Chapman*, 386 U.S. 18 (conclusion beyond reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial), have been met. See, *e.g., Ward*, 292 Kan. at 549; *State v. Adams*, 292 Kan. 60, 66-67, 253 P.3d 5 (2011); *State v. Tosh*, 278 Kan. 83, 93, 91 P.3d 1204 (2004).

But this court recently recognized that the applicable level of certainty required differs under state statutes and federal Constitution. If the fundamental failure infringes on a constitutional right, appellate courts apply the federal constitutional standard, which requires the party benefitting from the error to prove beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record. *Ward*, 292 Kan. at 568-69. And if a fundamental failure does not infringe a constitutional right, appellate courts apply K.S.A. 60-261 and K.S.A. 60-2105 to determine "if there is a reasonable probability the misconduct affected the outcome of the trial." *Inkelaar*, 293 Kan. at 430; *Ward*, 292 Kan. at 569.

Since our cases require that both standards be satisfied in the prosecutorial misconduct context, the State, as the party who ben-

efitted from the misconduct, bears the burden to establish beyond a reasonable doubt that the error did not affect the defendant's substantial rights, *i.e.*, there is no reasonable possibility the error affected the verdict. In short, the third factor cannot override the first two factors unless we are able to say the *Chapman* constitutional error standard has been met. *Inkelaar*, 293 Kan. at 431.

Turning to the facts in this case, the prosecutor's simplistic misstatement that anger cannot constitute heat of passion in contradiction of repeated statements from this court to the contrary is gross and flagrant, but it occurred only once and was preceded by an interrupted statement from the prosecutor that anger was not applicable in this case. Taken together, we do not find deliberate misconduct or indifference to any district court rulings. As to the third factor, whether the evidence against the defendant was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of the jurors, we hold there is no reasonable possibility that the error affected the verdict. In this case, the videotape of the actual crime as it was committed permitted the jury to evaluate fully the circumstances. The prosecutor's misstatement of the law was isolated and could not have overridden the other evidence in the case, particularly the video of the crime as it occurred.

### ISSUE 5: MCCULLOUGH'S *BATSON* CHALLENGE

Next, McCullough argues that the State's exercise of a peremptory challenge to strike M.S., the only African-American male, from the jury panel violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). She makes two alternative arguments. First, she contends the district court failed to complete the required third step of the *Batson* analysis, so the case must be remanded for a full *Batson* hearing. Second, and in the alternative, McCullough argues the State's proffered reason for striking M.S. was pretextual, demonstrating purposeful discrimination, which entitles her to a new trial.

*Standard of Review*

Batson challenges are subject to a three-step analysis. Each step is governed by its own standard of review. *State v. Hill*, 290 Kan. 339, 358, 228 P.3d 1027 (2010); *State v. Pham*, 281 Kan. 1227, 1237, 136 P.3d 919 (2006). Under the first step, the party challenging the strike must make a prima facie showing that the other party exercised a peremptory challenge on the basis of race. Appellate courts utilize plenary or unlimited review over this step. *Hill*, 290 Kan. at 358. But if that prima facie case is established, the burden shifts to the party exercising the strike to articulate a race-neutral reason for striking the prospective juror. This reason must be facially valid, but it does not need to be persuasive or plausible. The reason offered will be deemed race neutral unless a discriminatory intent is inherent in the explanation. The opponent of the strike continues to bear the burden of persuasion. 290 Kan. at 358.

In the third step, the district court determines whether the defendant has carried the burden of proving purposeful discrimination. This step hinges on credibility determinations because usually there is limited evidence on the issue, and the best evidence is often the demeanor of the party exercising the challenge. As such, it falls within the trial court's province to decide, and that decision is reviewed under an abuse of discretion standard. *Pham*, 281 Kan. at 1237; see *Hill*, 290 Kan. at 358-59.

*The district court did not abuse its discretion*

To establish her prima facie case, McCullough notes that M.S. was the only African-American male, and he was struck from the jury panel even though his answers were consistent with those given by other jurors. McCullough argues the decision to strike M.S. must be race based because M.S. displayed two traits typically considered favorable to the prosecution—family members who were police officers and a family member who was a victim of a crime.

In response to the challenge made at trial, the State proffered that it struck M.S. because he was almost 20 minutes late to court after the lunch recess the first day of voir dire and a member of

his family was the victim of a gang-related homicide. The State argued these reasons were applied race neutrally because it struck a non-African-American juror for the same tardiness issue and it would have struck another juror because of that juror's involvement in a violent crime, except defense counsel struck her first. To counter the State's proffered reasons, McCullough argued M.S.'s tardiness was excusable because M.S. said he had trouble parking that day and had arrived early one morning while some other jurors were late. McCullough did not identify which other jurors were late or respond to the prosecutor's claim that the tardiness explanation was applied race neutrally. Regarding the prosecutor's second reason for striking M.S., there was some dispute as to how closely related M.S. was to the victim of violent crime, but McCullough's counsel essentially argued the crime was remote in time and the familial relationship with a crime victim was distant.

After hearing these arguments, the district court held:

"[T]he ruling centers on whether or not the strike was based on race or other gender protected areas, as distinguished from having a racial neutral . . . reason for making a strike. There were yesterday 45 people subject to examination, 43 of them apparently did arrive back from the recess on time. So the fact that [M.S.] is one of two and that the other person was struck, as well, does establish some racial neutral basis, whether or not one might disagree with it.

"There's a second reason that was given with regard to [M.S.] being the victim of a crime. And [the prosecutor] indicated there were two, I believe, other people who she would have struck or did strike for those same reasons. *And I find that she has stated a racial neutral reason for striking [M.S.] and the* Batson *challenge will be denied."* (Emphasis added.)

McCullough's first challenge is to the sufficiency of the district court's findings. She argues the trial court prematurely terminated its analysis at the second step and the matter should be remanded to determine whether McCullough carried her burden of establishing purposeful discrimination in the third step. This claim has some merit because the record does not contain a clearly articulated analysis of the third step, even though the district court clearly considered the issue and tried to follow the established procedure. But the district court's express holding that the prosecutor articulated a race-neutral reason for striking the juror relates only to the second step. And under our caselaw, the prosecution's ability to

articulate a race-neutral explanation simply advances the discussion to the third step for the trial court to decide whether defendant has carried the burden of proving purposeful discrimination.

But McCullough's argument still fails on two grounds. First, McCullough failed to preserve the issue for appeal by objecting to the district court's analysis of this issue. In *State v. Angelo*, 287 Kan. 262, 278, 197 P.3d 337 (2008), this court held a party must object to the district court's failure to complete the third step to preserve the issue because a timely objection gives the trial court an opportunity to clarify or cure the defect. Second, and even if the issue is preserved, McCullough's claim fails because the district court's analysis of the third step can be implied from its consideration of the prosecutor's reasons and the defendant's rebuttal of them before overruling the *Batson* challenge.

In *Angelo*, the trial court performed the same perfunctory analysis attacked in McCullough's appeal and held that the prosecutor stated a race-neutral reason for striking the juror. It then overruled the objection. This court found that the trial court "impliedly held" the defendant failed to satisfy his burden to prove purposeful discrimination because the trial court "essentially performed its analysis under the third *Batson* step" by listening to the State's reasons and the defendant's rebuttal before overruling the objection. 287 Kan. at 274-75. But the *Angelo* court did note that the better analysis for a district court faced with a *Batson* challenge would be to identify and follow each step, concluding where applicable that the defendant " 'has not carried his burden of proving purposeful discrimination.' " 287 Kan. at 278. Likewise, the trial court's consideration of the rebuttal argument in McCullough's *Batson* challenge can be implied from the fact that McCullough was given an opportunity to rebut the State's proffered race-neutral reasons and the district court did not rule until after the rebuttal argument was heard.

McCullough also challenges the ultimate determination that a *Batson* violation did not occur. She argues the State's proffered reasons were obviously pretextual and the failure to present a non-pretextual reason supports a finding that it was purposeful discrimination, entitling her to a new trial. As to this claim, McCullough

is essentially challenging the district court's determination of the third *Batson* step, which is somewhat problematic since this court is faced with an "implicit holding" as opposed to any express analysis of the issue. But as discussed above, this court reviews the third step under an abuse of discretion standard. That standard is set out in *Ward*, 292 Kan. at 550.

Courts may consider several factors when determining whether a defendant met his or her burden of purposeful discrimination, including the presence of other members of the same minority on the jury and whether "white potential jurors were removed for the same reasons African-Americans were removed." *Angelo*, 287 Kan. at 274. And even though it was not addressed by the district court, the first factor supports the district court's finding because an African-American female was empanelled on the jury, along with several other ethnic minorities. In addition, the State heavily emphasized its similar treatment across race when it noted that it also struck the only other potential juror who was late during the first day of voir dire and that juror was not an African-American. The district court clearly considered this factor because it noted 43 of the 45 jurors returned on time and the State struck both tardy jury members. Attempts by McCullough to rebut this consideration by arguing some potential jurors were late the next morning fail because she did not show any were white and that prosecutors declined to use peremptory challenges to strike them.

The district court also acknowledged credibility for the State's claim that M.S. was struck because his family member was a crime victim because other jurors were struck for the same reasons. This is consistent with the State's race-neutral explanation that it intended to strike another juror for the same reason, but defense counsel struck that juror first. McCullough's rebuttal to this focused on the remoteness of the family member subject to the crime, but she did not allege the prosecutor declined to strike a similarly situated white juror. These facts support the race-neutral explanation proffered by the State. We conclude the district court did not abuse its discretion by overruling McCullough's *Batson* challenge.

## ISSUE 6: REFUSAL TO STRIKE FIVE JURY PANEL MEMBERS FOR CAUSE

McCullough next argues the district court erred by denying her motion to strike five jurors for cause. All five jurors were removed by peremptory challenge. The State struck two of them, and McCullough struck the other three jurors. McCullough then exercised nine other peremptory challenges and passed the remaining jurors for cause. But she argues that the erroneous denial of her challenge for cause was prejudicial because she would have exercised one of those peremptory challenges to remove M.V.

*Standard of Review*

To prevail, McCullough must establish the trial court erred and that she was prejudiced. See *State v. Ransom*, 289 Kan. 373, 389, 212 P.3d 203 (2009). Appellate courts review the trial court's ruling on a challenge for cause for an abuse of discretion because the trial court is in a better position to view the prospective jurors' demeanors as they are questioned. The party asserting an abuse of discretion bears the burden of establishing it. 289 Kan. at 389. But even if we assume McCullough can show the trial court abused its discretion, it is unnecessary for this court to determine whether these jurors should have been removed for cause because McCullough did not establish prejudice.

Prejudice cannot be established through the loss of a peremptory challenge alone. " '[T]he loss of a peremptory challenge [does not] constitute[] a violation of the right to an impartial jury.' " *State v. Crawford*, 255 Kan. 47, 51-52, 872 P.2d 293 (1994) (quoting *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S. Ct. 2273,101 L. Ed. 2d 80, *reh. denied* 487 U.S. 1250 [1988]). Peremptory challenges are simply a means to achieve an impartial jury, and the true inquiry is whether the jury that ultimately sits is impartial. *State v. Heath*, 264 Kan. 557, Syl. ¶ 17, 957 P.2d 449 (1998).

*The district court did not err in denying the motion to strike*

McCullough argues the jury was not impartial because M.V., a teacher, indicated M.V. had discussed "not the crime itself, but the aftermath" with some of her school classes. M.V. was referring to

news stories reported by several media outlets that no one in the store at the time of the stabbing tried to assist Callaway while she lay bleeding before the ambulance arrived. Instead, the news accounts indicated, some customers stepped around Callaway to complete their purchases, and one even took Callaway's picture with a camera phone.

But this coverage was not relevant to the trial because McCullough had already left the store's parking lot, and she was not involved. The attorneys, however, inquired during voir dire whether anyone had seen the media coverage to determine whether that knowledge would prevent the juror from being impartial. And although M.V. was aware of the coverage and she had discussed it at her school, she indicated her knowledge of the "aftermath" would not affect how she viewed the case. The discussion during voir dire was:

"[Counsel]: . . . [H]aving that knowledge, at least that's what was reported in the media about this, would that affect how you'd perceive this case as it relates to Cherish McCullough?

"[M.V.]: No, because even when we discussed it in my class with my students it was the actions of those individuals that we were discussing, you know, with no knowledge of what had happened that lead up to, you know, what caused it. See, I in no way decided it had anything to do with the case in general, it was just those people's reactions.

"[Counsel]: So you'd be able to follow the judge's instructions, if he gives them to you, to disregard that as it relates to this case?

"[M.V.]: Yes."

These statements do not support McCullough's assertion now on appeal that M.V. could not act impartially or without prejudice. This conclusion is bolstered by the fact that McCullough's counsel later passed M.V. for cause. McCullough was not prejudiced by the trial court's refusal to strike the five jurors for cause.

## ISSUE 7: DID OUTBURSTS FROM TRIAL SPECTATORS PREJUDICE THE DEFENDANT'S RIGHT TO A FAIR TRIAL

For the first time on appeal, McCullough claims that comments and emotional outbursts from trial spectators prejudiced her right to a fair trial and now require remand for a new trial. The State claims this issue was not preserved or, in the alternative, that

McCullough failed to make an adequate record of the disturbances to merit review. We agree and hold that this assertion of error was not preserved. We also find the record inadequate to address the question, even if it could be reached.

Trial courts have a duty to maintain order and ensure that justice is not obstructed by a person or persons. *State v. McNaught*, 238 Kan. 567, 577, 713 P.2d 457 (1986). Emotional outbursts and demonstrations often occur, particularly in homicide cases. Nevertheless, emotional outbursts, weeping, fainting, applause, or other demonstrations can prejudice a defendant's right to a fair trial. See *State v. Franklin*, 167 Kan. 706, 709-10, 208 P.2d 195 (1949). Trial courts are granted broad discretion to determine whether the jury was or could have been influenced by a disturbance. That discretion will not be disturbed on appeal unless it appears prejudice occurred. *McNaught*, 238 Kan. at 577-78.

While McCullough indicated there were problems with spectators at several points during the trial, she never requested the trial court to admonish the jury or sought a mistrial. McCullough also failed to argue these outbursts violated her right to a fair trial in her motion for new trial. Generally, appellate courts do not address constitutional issues for the first time on appeal. For an appellate court to proceed under these circumstances, it is necessary for the party raising the constitutional issue to satisfy one of three recognized exceptions to the general rule, which are: (1) The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the district court is right for the wrong reason. *State v. Gomez*, 290 Kan. 858, 862, 235 P.3d 1203 (2010).

McCullough argues this court considered this issue for the first time on appeal in *Franklin* and the claim therefore is properly before this court. But while McCullough is correct that the defendant in *Franklin* did not request an admonition or move for mistrial after a spectator's outburst, *Franklin* is distinguishable because the defendant raised the issue in a motion for new trial. In addition, *Franklin* predates this court's more assiduous approach

to preservation of error issues. See *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009) (stressing the importance of the legislative mandate in K.S.A. 60-404).

A contemporaneous effort by counsel to address courtroom outbursts on the record is important because the trial court witnessed the outburst, viewed the jury's reaction, if any, and its determination of whether the circumstances justify intervention gives the situation context that is beneficial for appellate review. A timely trial objection also helps ensure that a sufficient record is created for appeal. The party claiming an error occurred has the burden of designating a record that affirmatively shows prejudicial error. *State v. Nguyen*, 285 Kan. 418, 430, 172 P.3d 1165 (2007).

The record from McCullough's trial discloses several instances when disturbances to the court proceedings are referenced—several times during voir dire and three at trial. Outside the presence of the jury pool, McCullough's counsel indicated that three members of the victim's family had rushed from the courtroom in tears at different times during the final 2 days of voir dire. The district court indicated it did not see any spectators leave, instructed the State to admonish its witnesses and spectators to maintain courtroom decorum, and assured McCullough's counsel it would remove any spectators that were unwilling to comply.

At trial, McCullough's counsel indicated that the victim's family was sitting behind him in close proximity to the jury and he could hear them talking and laughing during his cross-examination of a detective. He also stated that someone was crying earlier that day. The State appears to concede one of the victim's family members had run out of the courtroom in tears the previous day, and the prosecutor had instructed them not to do that again. But she claimed the defendant's family was also making audible "sighs and stuff" during trial. The district judge indicated he was unable to hear any conversations, but he agreed to admonish all spectators to behave with decorum. McCullough's counsel responded, "I think that's appropriate." With that statement, defense counsel appeared fully satisfied with the trial court's suggested outcome.

The only contemporaneous record of a disturbance occurred later while McCullough's counsel questioned a witness. The district

court stated *sua sponte*, "Let's have the other lady also step out, ma'am." At which point an unidentified spectator stated, "I don't want to go, I want to see everything. I have her kids, I want to stay and see everything." After the spectator agreed to respect courtroom decorum, the trial proceeded without further discussion. There is no record of what caused the trial court to admonish this spectator or whether the jury had any knowledge of a disturbance before the trial court spoke. And while it is possible the spectator's comments referred to the victim's children, there is nothing establishing this point or even explaining how it would matter. Defense counsel did not request any additional remedial action the court should have taken.

The last discussion about disturbances occurred during the instructions conference when McCullough's counsel indicated he could hear comments by spectators during his examination of witnesses. Counsel indicated he was concerned because spectators were within 10 feet of the jury. He then warned that he would file a motion for mistrial if it occurred during closing argument. But again, counsel did not identify which spectators were making the comments, and there is no record regarding the substance of the disturbance. The decision by McCullough's counsel not to file a motion for mistrial as threatened is a strong indication that there was not another disturbance and that the concern did not materialize.

In short, at no time did defense counsel lodge an objection to the manner in which the district court was handling an obviously emotional trial setting. The failure to pose an objection is a failure to preserve the issue. *Gomez*, 290 Kan. at 862. We also find no basis to consider any of the possible exceptions. The appellate record establishes there were some disruptions at trial, but the record is inadequate to determine whether McCullough's right to a fair trial was violated. The spectators causing the disturbance were rarely identified, the substance and extent of the disturbance is unknown, and it is unclear whether the jury even was aware of the disturbances.

Affirmed.

MORITZ, J., not participating.

LEBEN, J., assigned.