NOT DESIGNATED FOR PUBLICATION

No. 116,931

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHRISTIAN PETERSON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; MICHAEL GROSKO, judge. Opinion filed October 5, 2018. Remanded in part with directions.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Daniel J. Obermeier*, assistant district attorney, *Jennifer S. Tatum*, assistant district attorney, *Mark A. Dupree Sr*., district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., HILL, J., and STUTZMAN, S.J.

PER CURIAM: A jury sitting in Wyandotte County District Court convicted Christian Peterson of aggravated indecent liberties with a child and found him not guilty of lewd and lascivious conduct. Because the district court failed to adequately examine Peterson's contention that the jurors may not have been selected in a race-neutral way, we remand for further proceedings on that point and hold in abeyance his other challenges to the conviction and the resulting sentence.

1

Given the narrow issue we address, we dispense with any outline of the conflicting factual accounts of the events underlying the charges. We focus on jury selection and Peterson's claim the prosecutor may have used peremptory strikes to remove potential jurors based on their race—commonly known as a *Batson* challenge.

Batson *Principles Outlined*

We necessarily begin with *Batson v. Kentucky*, 476 U.S. 79, 88-89, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and the United State Supreme Court's holding that in criminal cases, prosecutors may not rely on race as a criterion to excuse African-Americans called as potential jurors. We also draw heavily, often verbatim and without further attribution, from *State v. Jenkins*, No. 117,026, 2018 WL 2375788 (Kan. App.) (unpublished opinion), *petition for rev. filed* June 22, 2018, this court's most recent discussion of *Batson* and its allied principles.

In *Batson*, the Court recognized twin equal protection considerations supporting a prohibition on the State's use of racially based peremptory challenges or juror strikes. First, defendants are denied the right to equal protection if the State seeks to try them before juries "from which members of [their] race have been purposefully excluded." 476 U.S. at 85. Just as important, however, citizens called for jury duty have a constitutional right to serve if they are otherwise qualified. The State violates that right when a prosecutor eliminates them during the jury selection process because of their race. 476 U.S. at 87. Exclusion of citizens from jury service based on race reflects "a primary example of the evil the Fourteenth Amendment was designed to cure." 476 U.S. at 85; see *Miller-El v. Dretke*, 545 U.S. 231, 237-38, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) (noting the dual equal protection violations attendant to the State's race-based removal of potential jurors during the selection process).

The Court has extended the rule of *Batson* to permutations of the essential fact pattern present there—the State's systematic use of peremptory strikes to remove African-Americans from the jury pool in the trial of an African-American defendant on criminal charges. For example, a Caucasian defendant may assert a *Batson* challenge to the prosecutor's apparently deliberate removal of African-Americans called as jurors in a criminal case. *Powers v. Ohio*, 499 U.S. 400, 415-16, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). The State may challenge a defendant's use of peremptory challenges in what appears to be a racially motivated fashion. *Georgia v. McCollum*, 505 U.S. 42, 59, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992).[1]

[1]The Court has recognized that Hispanics reflect a sufficiently identifiable racial or ethnic group to be protected by the *Batson* rule. *Hernandez v. New York*, 500 U.S. 352, 355, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (prosecutor's deliberate exclusion of Hispanics from jury would violate Equal Protection Clause). The Court has also extended the principle underlying *Batson* to the State's systematic exclusion of women from juries based on gender. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994). Some courts have recognized *Batson* challenges to the removal of potential jurors because of their religious beliefs. See *United States v. Brown*, 352 F.3d 654, 668-69 (2d Cir. 2003); but cf. *United States v. Girouard*, 521 F.3d 110, 113 (1st Cir. 2008) (regarding the question as an open one and declining to decide it). Likewise, neither plaintiffs nor defendants in civil cases may purposefully strike potential jurors because of their race. *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 616, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991).

All of those decisions reflect the independent significance of the equal protection rights of citizens called to jury service to participate in the judicial process without facing racial or other invidious discrimination. See *Powers*, 499 U.S. at 402, 409. A defendant's *Batson* challenge serves to protect the rights of those citizens, since they are not in a position to efficiently or effectively assert their own rights. 499 U.S. at 413-15. Moreover, the eradication of purposeful racial discrimination in juror selection promotes the integrity of the judicial system in the eyes of the litigants, other participants, and the community as a whole. *McCollum*, 505 U.S. at 48-49; *Powers*, 499 U.S. at 412-13.

The ultimate question in a *Batson* challenge asks whether the prosecutor has purposefully and deliberately sought to exclude potential jurors because of their race or another protected class characteristic. The analytical framework for answering that question draws on the model developed in employment discrimination cases to probe an employer's intent in hiring, firing, promoting, or otherwise making workplace decisions. *Johnson v. California*, 545 U.S. 162, 170-71 & n.7, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005). Peterson based his challenge on race, so we focus our discussion accordingly. Because purposeful racial discrimination typically is difficult to prove—seldom will the discriminatory actor admit the illicit purpose—the approach imposes shifting burdens of production of circumstantial evidence. The inquiry advances in three stages. *Foster v. Chatman*, 578 U.S. ___, 136 S. Ct. 1737, 1747, 195 L. Ed. 2d 1 (2016); *State v. Kettler*, 299 Kan. 448, 461-62, 325 P.3d 1075 (2014).

The party challenging the peremptory strikes—here, the criminal defendant alleging racial discrimination in the State's selection of jurors—has to make a prima facie showing of impermissible intent on the part of the prosecutor. *Miller-El*, 545 U.S. at 239; *Johnson*, 545 U.S. at 168; *State v. McCullough*, 293 Kan. 970, 992, 270 P.3d 1142 (2012). The burden at the first stage is not intended to be onerous. *Johnson*, 545 U.S. at 170 (initial burden satisfied if the proffered evidence is "sufficient to permit the trial judge to draw an inference that discrimination has occurred"). The systematic use of peremptory challenges to remove members of a protected racial class from the pool of potential jurors typically would suffice. *Miller-El*, 545 U.S. at 240-41. The exercise of a few peremptory strikes (among many) to remove all members of an identifiable ethnic group from the jury pool provides a prima facie indicator of impermissible animus. See *Johnson*, 545 U.S. at 173. The prosecutor's disparate questioning of African-American and Caucasian jurors in an apparent effort to generate grounds to disqualify the African-Americans for cause likely would establish a prima facie case for the later use of peremptory strikes to keep those persons from serving on the jury. See *Miller-El*, 545 U.S. at 255-60.

4

If the defendant presents such evidence, the prosecutor is then obligated to state a racially neutral reason for the exercise of the disputed peremptory challenges. *Miller-El*, 545 U.S. at 239; *Johnson*, 545 U.S. at 168; *McCullough*, 293 Kan. at 992. Again, the burden at that second stage is slight. *Purkett v. Elem*, 514 U.S. 765, 767-68, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) ("The second step of this process does not demand an explanation that is persuasive, or even plausible."). The prosecutor's ability to voice a nondiscriminatory rationale for his or her approach to juror selection does not in and of itself defeat the *Batson* challenge. *Miller-El*, 545 U.S. at 240. That simply advances the district court's inquiry to the third step and the ultimate question of whether purposeful discrimination has been shown based on all of the available evidence. 545 U.S. at 251-52; *Purkett*, 514 U.S. at 768; *McCullough*, 293 Kan. at 993-94. The district court must determine if the prosecutor's stated reasons for excluding the potential jurors are the true reasons or merely a pretext—a cover-up—for impermissible racial discrimination. As the *Purkett* Court explained: "At that [third] stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." 514 U.S. at 768. In making that call, the district court may look at various forms of circumstantial evidence. See *Miller-El*, 545 U.S. at 253. The party asserting the *Batson* challenge bears the ultimate burden of proving by a preponderance of the evidence that racial discrimination or intent substantially motivated the peremptory strikes. *Crittenden v. Ayers*, 624 F.3d 943, 958 (9th Cir. 2010); *United States v. Martinez*, 621 F.3d 101, 109 (2d Cir. 2010); see also *Snyder v. Louisiana*, 552 U.S. 472, 485, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008) (suggesting but not deciding prosecutor might prevail if racial discrimination were one of several factors in striking potential juror as long as it "was not determinative").

5

Batson *Principles Applied*

Here, the district court cut off the *Batson* inquiry at the first stage, finding that Peterson failed to make a prima facie showing of possible racial discrimination on the part of the prosecutor in selecting jurors. The record of the *Batson* challenge and the district court's ruling is, in a word, terse; it barely fills a page of the trial transcript. We have gleaned from the record that Peterson is African-American. Although a defendant need not belong to an ethnic minority to assert a *Batson* challenge, his or her ethnicity could be relevant in assessing whether racial animus is afoot in jury selection, especially when potential jurors sharing the defendant's ethnic background have been struck from the panel. *Powers*, 499 U.S. at 416.

The prosecutor and Peterson's lawyer elected to pass for cause enough potential jurors so they would have a jury of 12 with one alternate to hear the evidence after they used all of their peremptory strikes. See K.S.A. 22-3411a (at request of either party, district court must pass for cause panel of potential jurors equal to 12 plus the number of peremptory strikes allotted to both parties). Because aggravated indecent liberties with a child is an off-grid felony, the State and Peterson each had 12 peremptory strikes. See K.S.A. 2017 Supp. 22-3412(a)(2)(A). We, thus, infer there were 39 potential jurors after the district court disposed of any challenges for cause. See K.S.A. 2017 Supp. 22-3412(c) (if district court empanels alternate juror, each party entitled to additional peremptory strike).

Each side then struck or removed one potential juror at a time in alternating fashion, beginning with the prosecutor, until all but 13 persons had been eliminated. The parties made their strikes outside the presence of the potential jurors, but nothing in the appellate record describes the process they used. So we don't know exactly what the lawyers did.[2]

6

[2]In one common method, the lawyers literally strike through a potential juror's name on a seating chart with a pen and indicate whether the strike is by the State or the defendant and the number of the strike, e.g., State #1 or Δ #7. The chart containing the strikes is then commonly made part of the district court record. No such chart or any other written memorialization of the strikes appears in the record on appeal. The district court judge was talking to the potential jurors as the lawyers were making their strikes, so he wasn't actively involved in or supervising the process. We don't mean to suggest some sort of direct judicial supervision would be necessary if, for example, the lawyers were passing a seating chart back and forth to record their strikes.

After the process had been completed, the district court announced the names of the jurors and the alternate who had been selected to hear the evidence. Peterson's lawyer then immediately asked for a conference outside the jurors' presence. At the start of the bench conference, the lawyer stated he was making a *Batson* challenge. He said based on the "jury questionnaires," seven of the prospective jurors passed for cause identified themselves as African-American and the prosecutor had peremptorily struck five of them. Of the two remaining African-Americans, the lawyer pointed out that one would be among the 12 jurors and the second would be the alternate juror. Neither the prosecutor nor the district court took issue with the lawyer's racial identification of the potential jurors. See *Jenkins*, 2018 WL 2375788, at *8 (lawyers disagreed over whether prospective juror was Hispanic; district court tacitly concluded she was not, while offering defendant's lawyer opportunity to inquire further of her).

The district court interjected that "saying numbers" likely didn't amount to a "prima facie showing" when "[w]e have . . . two blacks [] on the jury." The district court then asked, "Your response?" The prosecutor began to explain why she peremptorily struck one of the jurors. The district court cut her off and repeated that Peterson's lawyer failed to satisfy the initial showing required under *Batson's* shifting burdens of production. The district court then denied Peterson's challenge. So the prosecutor never explained why she removed the five African-Americans as prospective jurors. And Peterson, of course, never had the chance to dispute those explanations as pretext for impermissible racial discrimination.

7

In context, we wonder whether the district court's request for a response was actually directed to Peterson's lawyer to find out if he had additional support for his *Batson* challenge. The prosecutor, however, immediately jumped in to address the second step of the *Batson* process rather than endorsing the district court's conclusion that Peterson's lawyer failed to satisfy the first step. Peterson's lawyer wasn't really given another opportunity to expand upon the circumstances suggestive of possible racial animus or to otherwise speak to the issue.

On appeal, Peterson has raised the district court's denial of his *Batson* challenge, among other points. From our perspective, the *Batson* issue entails no disputed facts and, thus, presents related questions of law we decide without deference to the district court. See *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010) (appellate court exercises unlimited review over question of law); *State v. Bennett*, 51 Kan. App. 2d 356, 361, 347 P.3d 229 (when material facts undisputed, issue presents question of law), *rev. denied* 303 Kan. 1079 (2015); *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 258-59, 261 P.3d 943 (2011) (legal effect of undisputed facts question of law).

The questions, however, are narrow ones: Did the district court impermissibly terminate the *Batson* inquiry at the first step of the process? And, if so, what is the proper remedy?

Two considerations bear repeating as we answer those questions. First is the slight burden of production upon a defendant at the initial stage of the *Batson* inquiry. The circumstances merely must be suggestive of possible racial discrimination in jury selection to warrant further examination. As we have outlined, the next step requires the prosecutor to voice explanations for the strikes that presumably will be race neutral. And the defendant then gets to identify information casting substantial doubt on those reasons as the true reasons. *Johnson*, 545 U.S. at 172 ("The *Batson* framework is designed to

8

produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process.").

Second, the *Batson* rule vindicates the equal protection rights of those persons called for jury duty to serve without being excluded because of their race or some other protected class characteristic. That purpose cannot be underestimated or shortchanged. A core value of the Fourteenth Amendment guarantees that both the rights and obligations of citizenship should be shared equally without regard to race. If race becomes the deciding factor in excluding even a single potential juror, then the selection process violates the Fourteenth Amendment. See *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 142 n.13, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994) ("The exclusion of even one juror for impermissible reasons harms that juror and undermines public confidence in the fairness of the system."); *United States v. Cruse*, 805 F.3d 795, 809 (7th Cir. 2015) ("The Equal Protection Clause is violated if even a single juror is excluded because of invidious racial discrimination.").

Statistics do not prove a *Batson* violation if a prosecutor presents valid nondiscriminatory reasons for striking African-Americans or other minorities from a jury panel. In other words, numbers alone fail to establish the requisite illicit intent to discriminate because of race. But an obviously skewed use of peremptory strikes to remove members of an identifiable ethnic group would call for some explanation, given the constitutional rights at stake. The validity of that race-neutral explanation can then be assessed based on all of the evidence, including numerical disparities.

Here, the threshold requiring a prosecutor to explain a pattern of strikes has been crossed. The prosecutor peremptorily removed five of seven prospective African-American jurors—about 71 percent of those on the panel. And that's more than chance or sheer randomness would at least superficially suggest. Overall, the prosecutor presumably peremptorily excused 13 of 39 potential jurors or about 33 percent of the

9

group. Thirty-three percent of the seven African-Americans on the panel would have been two. We recognize those are crude measures based on small populations, and the exercise of each set of peremptory challenges altered the composition of the remaining pool of potential jurors.

But we are not tackling a statistics final examination—an undertaking we recognize we almost surely would fail. Rather, we are assessing whether on outward appearances, one might fairly ask if race could have played a part in the prosecutor's decisions on who to remove from the jury panel. Under the circumstances, we find it to be both a reasonable question and one for which there may be a perfectly reasonable answer having nothing to do with race. Those circumstances, however, tilt in favor of requiring an explanation. The weight of authority governing *Batson* challenges supports further inquiry.[3]

[3] See *Batson*, 476 U.S. at 97 ("[A] 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination."); *Miller-El*, 537 U.S. at 331 (relying, in part, on statistical evidence that prosecution struck 91% (10 out of 11) of the eligible African-American jurors and 13% (4 out of 31) of the eligible Caucasian jurors to find that the defendant established a prima facie case of racial discrimination); *Turner v. Marshall*, 63 F.3d 807, 813 (9th Cir. 1995) ("[T]he prosecutor's exclusion of five out of nine available African-American venirepersons removed a sufficient percentage of African-Americans to establish a pattern of discrimination," even when four African-American women remained on the jury), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999); *United States v. Alvarado*, 923 F.2d 253, 255-56 (2d Cir. 1991) (prima facie showing where prosecutor used four of seven peremptory challenges to remove minorities, reflecting rate much higher than would be expected by chance); *Fleming v. Kemp*, 794 F.2d 1478, 1484 (11th Cir. 1986) (removal of 8 of 10 African-Americans from venire panel consisting of 10 African-Americans and 45 Caucasians constituted prima facie showing of discriminatory intent); but see *Ex parte Walker*, 972 So. 2d 737, 741 (Ala. 2007) ("An objection based on numbers alone, however, does not support the finding of a prima facie case of discrimination and is not sufficient to shift the burden to the other party to explain its peremptory strikes.").

In finding Peterson satisfied the first step in the Batson inquiry, we have treated the African-American seated on the jury and the African-American alternate juror equivalently. But the way the alternate was chosen could bolster the numerical prima facie case and could provide independent circumstantial evidence of intent. The record is silent on the method. The lawyers clearly knew the identity of the alternate juror at the time of the *Batson* challenge. At oral argument, the State's lawyer, who did not try this case, explained that potential jurors are assigned numbers and, by common practice in Wyandotte County, the remaining juror with the highest number serves as the alternate. If that were done here, the prosecutor could have channeled the African-American juror into the alternate spot by striking white jurors with higher numbers. Everyone expected the trial to be short—it lasted two days—so the likelihood of the alternate juror participating in deliberations was slim. That sort of manipulation could be evidence of racial animus, even though the prosecutor would not have used a peremptory strike to eliminate an African-American from the jury panel. Cf. *United States v. Esparza-Gonzalez*, 422 F.3d 897, 904-06 (9th Cir. 2005) (prosecutor's waiver of peremptory challenge that, given selection method, affected racial composition of jury may be weighed in *Batson* challenge).

In sum, the district court erred in ruling Peterson had failed to satisfy the minimal requirements of the first step in the *Batson* inquiry. We, therefore, remand to the district court with directions to complete a full hearing at which the prosecutor will be expected to offer reasons for the State's peremptory challenges and Peterson will then be allowed to offer additional evidence disputing the legitimacy of those reasons. To be perfectly clear, we hold no opinion about the legitimacy of Peterson's *Batson* challenge. We have decided only that the inquiry should go forward in the district court.

Because Peterson must receive a new trial if he prevails on his *Batson* challenge, we defer ruling on his other appellate issues that would require the same relief: court error in admitting cumulative evidence; prosecutorial error in closing argument;

11

constitutionally ineffective assistance of his trial lawyer; and cumulative trial error. Peterson has also appealed the district court's imposition of lifetime postrelease supervision as part of an off-grid life sentence. Ruling on those issues now would be premature. So we retain jurisdiction over the case except for the *Batson* challenge.

*Considerations on Remand*

On remand, the district court should appoint a conflict-free lawyer to serve as Peterson's lead counsel on the *Batson* issue. Because of the unresolved ineffective assistance claim, Fredrick Zimmerman, who represented Peterson during the trial, cannot serve in that capacity. He also could be a witness in the *Batson* hearing. See Kansas Rule of Professional Conduct 3.7(a) (2018 Kan. S. Ct. R. 351) (lawyer should not act as advocate if he or she is likely to be witness in proceeding). As the trial lawyer for Peterson, Zimmerman almost certainly has specific (and perhaps unique) information bearing on jury selection in this case and likely would be a significant resource for Peterson's new lawyer leading up to and during the hearing.

The district court also ought to encourage and assist the lawyers in reconstructing the jury selection process as best they can. For example, clear findings or stipulations describing the process for striking potential jurors, the method of designating the alternate juror, and the racial composition of the jury panel passed for cause and the final jury would greatly enhance our ability to review the issue, should we be required to do so.

Assuming the prosecutor provides race-neutral reasons for the State's peremptory challenges, the district court may then explore a wide array of circumstances indicative of pretextual justifications for race based decisions. As we have mentioned, the markedly disproportionate use of peremptory strikes to remove African-Americans or other minorities from a jury pool will buttress other circumstantial evidence of racial animus,

12

especially when the ostensible explanations for the disparity are highly subjective ("negative" body language), strangely idiosyncratic (nightshift workers are nonconformists), or otherwise improbable. See *Purkett*, 514 U.S. at 768.

Shifting reasons for removing a potential juror may indicate pretext. *Foster*, 136 S. Ct. at 1750-51. That is, should an initial reason look unpersuasive under closer scrutiny, the prosecutor's sudden recollection of another reason suggests neither may be the real reason. See *Miller-El*, 545 U.S. at 245-46. Disparate questioning of African-American and Caucasian members of the jury panel could be considered suspicious. If the stated reason for striking a potential juror pertains to a particular experience or characteristic disclosed during voir dire, the prosecutor's failure to ask further about that circumstance may indicate the information really wasn't significant and has been offered to paper over an impermissible reason. See *Snyder*, 552 U.S. at 482-83; *Miller-El*, 545 U.S. at 244-46. If the prosecutor removes an ethnically identifiable juror ostensibly because of certain experiences or characteristics yet retains as jurors Caucasians with the same or similar experiences or characteristics, pretext looms over those decisions. *Foster*, 136 S. Ct. at 1750-51; *Snyder*, 552 U.S. at 483-84; *Miller-El*, 545 U.S. at 241, 244-48; *McCullough*, 293 Kan. at 995.

In *Foster*, the Court found the prosecution trial team's notations about potential jurors unmistakably showed race to be a consideration that corresponded to the use of peremptory strikes to excuse African-Americans. 136 S. Ct. at 1755. A court may also consider historical data or information on the State's practices in excluding African-Americans or other minorities from jurors in other cases in the relevant district. *Miller-El*, 545 U.S. at 253; see *Batson*, 476 U.S. at 95 (defendant may present evidence of purposeful exclusion of African-Americans across multiple cases but need not do so).[4]

[4] The *Foster* Court recognized that the prosecutors' trial notes related to jury selection were appropriately considered in examining "'all of the circumstances'" bearing

13

on whether invidious discrimination infected the selection process. 136 S. Ct. at 1748. Uncertainty about who authored the notes went to their weight rather than admissibility. 136 S. Ct. at 1748. The notes commonly would be shielded by work-product privilege, since they reflect the lawyer's mental impressions and strategic considerations in choosing among potential jurors. See *Wichita Eagle & Beacon Publishing Co. v. Simmons*, 274 Kan. 194, 218-19, 50 P.3d 66 (2002) (policy behind privilege insulates lawyer's legal theories and strategies in case, fostering independence and objectives of adversarial process). The privilege, however, is not absolute and may be overridden for compelling reasons or waived. K.S.A. 2017 Supp. 60-426a(a) (waiver); 274 Kan. at 218.

In the second stage of the *Batson* inquiry, the prosecutor states specific reasons for challenged strikes of potential jurors, thereby disclosing ostensible mental impressions and strategies behind those decisions. That disclosure during the hearing entails a waiver of work-product privilege for notes related to jury selection for purposes of the *Batson* challenge, permitting their timely production. K.S.A. 2017 Supp. 60-426a(a); see *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989) (work-product privilege waived when lawyer voluntarily discloses information to court); *Stern v. O'Quinn*, 253 F.R.D. 663, 676-77 (S.D. Fla. 2008) (party waives work-product privilege by making protected information relevant to dispute and assertion of privilege would deprive opposing party of access to that highly probative information). Here, the notes would tend to confirm or refute the prosecutor's stated reasons. If they are consistent with the prosecutor's representations, no additional strategy has been disclosed. If they are inconsistent, they stand as circumstantial evidence of pretext. Given the fundamental equal protection rights at issue, work-product protection should yield to a full airing of evidence bearing on racial animus in jury selection. Apart from notes related to jury selection, however, work product privilege would continue to protect the rest of the prosecutor's trial preparation materials such as outlines for witness examination or closing argument.

Although Peterson continues to bear the burden of proof on the *Batson* challenge, his inability to fill evidentiary gaps material to the second and third steps in the process because of the passage of time should not be weighed against him. Those blind spots derive from the district court's decision to cut off the *Batson* inquiry before reaching those steps rather than from any omission or misstep on Peterson's part. If the delay precludes assembling an adequate record from which to fairly decide the *Batson* challenge, the consequences of that inadequacy fall on the State and, in turn, may require relief for Peterson. Cf. *Snyder*, 552 U.S. at 485-86 (given passage of time, no "realistic possibility" consideration of prosecutor's explanation for strike based on potential juror's

14

demeanor "could be profitably explored further on remand" in absence of contemporaneous findings by trial court).

If Peterson demonstrates the prosecutor exercised any of the peremptory strikes based on impermissible racial animus, he must receive a new trial. A successful *Batson* challenge establishes that at least one prospective juror has been the victim of impermissible invidious discrimination violating the Equal Protection Clause. And the injection of racial animus in the selection of jurors undermines both the appearance and reality of fundamental fairness in the judicial process. The resulting impact on a criminal prosecution effectively amounts to a structural error, requiring the reversal of any conviction without regard to the strength of the evidence supporting the guilty verdict. *Weaver v. Massachusetts*, 582 U.S. ___, 137 S. Ct. 1899, 1911-12, 198 L. Ed. 2d 420 (2017) (like errors "deemed structural," *Batson* violation requires "automatic reversal"); *Crittenden v. Chappell*, 804 F.3d 998, 1003 (9th Cir. 2015) (describing *Batson* violation as structural error); *United States v. McAllister*, 693 F.3d 572, 582 n.5 (6th Cir. 2012) (recognizing *Batson* violation not subject to harmless error review and characterizing harm as structural error); cf. *Vasquez v. Hillery*, 474 U.S. 254, 263-64, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986) (government's deliberate exclusion of African-Americans from grand jury indicting defendant undermines "structural integrity" of criminal justice process, cannot be excused as harmless error, and requires reversal of guilty verdict at trial). The Kansas Supreme Court has similarly recognized that a prosecutor's purposeful exclusion of potential jurors based on race requires a defendant be granted a new trial. See *Kettler*, 299 Kan. at 461-62.

We sum up our decision this way:

• We reverse and remand to the district court to conduct a complete hearing on Peterson's *Batson* challenge. Peterson needs to be appointed a lawyer for the hearing and should be present personally.

15

• If Peterson prevails on the *Batson* issue, he should be granted a new trial. If he loses on the *Batson* issue, we will take up the remaining issues he has raised. Either party may file a supplemental notice of appeal from the district court's ruling on the *Batson* challenge on remand if such an appeal would have been permitted following a final judgment or as otherwise provided in the Kansas Code of Criminal Procedure. The time for requesting an appeal shall run from the district court's filing of findings and conclusions or a journal entry. The party taking any appeal should ensure the appellate record is adequately supplemented to permit us to review the district court's disposition of the *Batson* challenge.

• We retain jurisdiction over the remaining issues Peterson has raised on appeal.

• The parties shall file joint or separate reports with the Clerk of the Appellate Courts on the status of the case on remand at 90-day intervals triggered by filing of this opinion.

Remanded in part with directions for further proceedings.

16