NOT DESIGNATED FOR PUBLICATION

No. 123,788

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of

SHELBY L. NUSZ,
*Appellant*,

and

MACKLIN R. NUSZ,
*Appellee*.

MEMORANDUM OPINION

Appeal from Kiowa District Court; SIDNEY R. THOMAS, judge. Opinion filed February 18, 2022. Affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellant.

*Grant A. Brazill*, of Morris, Laing, Evans, Brock & Kennedy, Chtd., of Wichita, for appellee.

Before MALONE, P.J., POWELL and ISHERWOOD, JJ.

POWELL, J.:  After seven years of marriage, Shelby L. Nusz (Shelby) sought a divorce from her husband, Macklin R. Nusz (Macklin). The district court conducted a bench trial at which it decided issues concerning property division, child custody, and child support. Unhappy with the district court's decision, Shelby moved to alter or amend its judgment, complaining the district court's orders were not supported by the evidence presented and that the district court was biased against her. After a hearing on Shelby's

motion, the district court rejected her allegations of error and bias and affirmed most of its findings.

Shelby now appeals and reprises many of the arguments she made before the district court, including her allegations of bias. In particular, Shelby contends the district court's findings are not supported by the evidence and the district court abused its discretion. After a review of the record, we decline to consider Shelby's claims of judicial bias as she failed to follow the proper statutory and appellate procedure for raising such claims. We also find sufficient evidence supports the district court's findings and Shelby has failed to meet her heavy burden that no reasonable person would agree with the district court's judgment. Thus, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Shelby and Macklin were married on May 4, 2012, and two children were born of the marriage: C.N., born in 2015, and A.N., born in 2017. At the time Shelby petitioned for divorce on July 16, 2019, both parties lived in Haviland, Kansas.

The district court issued a temporary order providing, among other things, that the parties would have joint legal custody and shared residency of C.N. and A.N. and an alternating week-to-week residency schedule. After the parties only achieved limited success at mediation, the district court conducted a bench trial in August 2020 to determine residential custody, parenting time, child support, spousal maintenance, the value of the parties' property, and the equitable division of that property.

At trial, the district court heard from several witnesses including the children's day care provider, Shelby's boss, a certified appraiser who appraised the value of the marital residence, a friend of the parties who worked with them in their outfitting business, and the parties themselves. After hearing the evidence, the district court valued the parties'

2

outfitting business and marital residence, determined each party's income, equitably divided the property, ordered spousal maintenance, and adopted a parenting plan that provided the parties would exercise joint legal custody of the children with shared residential custody on an alternating two-week basis. Shelby would be allowed to exercise her parenting time while residing in Wichita although the children would continue to reside in Pratt. The district court also ordered child support based upon each party's income and shared residency.

Unhappy with the district court's decision, Shelby filed a lengthy (44 pages) motion to alter or amend the judgment, extensively itemizing the errors she alleged the district court had made in its ruling. Moreover, and for the first time, Shelby alleged bias on the part of the district court and asked it to reconsider its ruling free of any bias. After a hearing on Shelby's motion, the district court reaffirmed most of its rulings. The district court also found no bias in its original ruling. However, Shelby filed no affidavit after the ruling as required by K.S.A. 20-311d.

Shelby now appeals.

I.      WAS THE DISTRICT COURT BIASED AGAINST SHELBY?

First, Shelby argues the district court was biased in its assessment of the evidence against her because the district court made factual findings unsupported by the evidence. In response, Macklin argues Shelby cannot raise any claims of judicial bias on appeal. Alternatively, he argues Shelby has failed to establish judicial misconduct that would warrant additional proceedings.

"'We exercise unlimited review over judicial misconduct claims, and review them in light of the particular facts and circumstances surrounding the allegation.' [Citation omitted.]" *State v. Boothby*, 310 Kan. 619, 624, 448 P.3d 416 (2019). The party alleging

judicial misconduct has the burden of establishing that the misconduct occurred and that it prejudiced the party's substantial rights. *State v. Miller*, 308 Kan. 1119, 1154, 427 P.3d 907 (2018).

A litigant may argue that a judge's recusal is required in accordance with (1) the statutory factors set forth in K.S.A. 20-311d(c); (2) the standards of the Kansas Code of Judicial Conduct, Supreme Court Rule 601B, Canon 2, Rule 2.2 (2022 Kan. S. Ct. R. at 495); and (3) the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *State v. Moyer*, 306 Kan. 342, 370, 410 P.3d 71 (2017). Shelby's allegations of judicial bias rest upon statutory and constitutional grounds.

K.S.A. 20-311d(a) provides a statutory procedure for a party or a party's attorney to move for a change of judge based on the belief "that the judge to whom an action is assigned cannot afford that party a fair trial in the action." "Under K.S.A. 20-311d, a party must first file a motion for change of judge; if that motion is denied, then the party must immediately file a legally sufficient affidavit alleging grounds set forth in the statute." *State v. Sawyer*, 297 Kan. 902, 908, 305 P.3d 608 (2013).

On appeal, Shelby concedes she failed to follow the procedural requirements of K.S.A. 20-311d requesting recusal of the judge but contends that this failure is not fatal to her bias claims. Shelby argues the allegations of judicial bias raised in her motion to alter or amend were sufficient to allow the district court to correct its errors and for appellate review. To support her argument, Shelby directs us to an unpublished opinion from another panel of our court which considered claims of judicial bias despite a lack of compliance with K.S.A. 20-311d. See *In re Marriage of Taylor*, No. 106,143, 2012 WL 1352867, at *3 (Kan. App. 2012) (unpublished opinion).

However, more recently, the Kansas Supreme Court has refused to consider a statutory judicial bias claim when the claimant failed to follow the proper statutory procedure. In *Sawyer*, our Supreme Court stated:

> "'When faced with an affidavit of prejudice filed pursuant to K.S.A. 20-311d, this court has unlimited review, and *on appeal must decide the legal sufficiency of the affidavit and not the truth of the facts alleged.* We examine whether the affidavit provides facts and reasons pertaining to the party or his or her attorney which, if true, give fair support for a well-grounded belief that he or she will not obtain a fair trial. We determine whether the charges are grounded in facts that would create reasonable doubt concerning the court's impartiality, not in the mind of the court itself, or even necessarily in the mind of the litigant filing the motion, but rather in the mind of a reasonable person with knowledge of all the circumstances.' [Citations omitted.]" (Emphasis added.) *Sawyer*, 297 Kan. at 908.

Relying on the emphasized language from *Sawyer*, our Supreme Court in *Moyer* found the claimant's failure to file an affidavit barred it from evaluating the judicial bias claim. The *Moyer* court held: "Obviously, without an affidavit in the record, we cannot 'decide the legal sufficiency of the affidavit.'" 306 Kan. at 372.

Like Shelby, the *Moyer* claimant also argued her failure to comply with the statutory procedure should not be fatal to the claim because our Supreme Court had previously considered such a claim despite failing to follow procedure in *State v. Alderson*, 260 Kan. 445, 454, 922 P.2d 435 (1996). *Moyer*, 306 Kan. at 372. The *Moyer* court distinguished *Alderson*, however, because the trial judge in *Alderson* informed the parties of his extrajudicial connection the day before the trial began. Due to the late disclosure, our Supreme Court chose to consider the claim in *Alderson* because it was "'somewhat reluctant to bar the defendant's claim simply because the defendant did not make an effort to comply with K.S.A. 20-311d.' 260 Kan. at 453." *Moyer*, 306 Kan. at 372.

5

Despite the claimant's reliance on *Alderson*, the *Moyer* court found it nevertheless could not review the judicial bias claim because "a piece that is critical to an effective appellate review of Moyer's statutory claim is missing from [the] record. Accordingly, Moyer's recusal claim under K.S.A. 20-311d is necessarily denied." 306 Kan. at 372.

Apart from alleging some grounds of bias in her motion to alter or amend, Shelby did not comply with the recusal procedure despite having a meaningful opportunity to do so. The evidentiary hearing—where the alleged bias occurred—was held on August 13-14, 2020, and the closing arguments were heard a couple weeks later on August 31, 2020. The district court made its oral findings from the bench the same day. The decree of divorce and parenting plan—detailing the district court's oral findings—was filed by the district court about six weeks later, on October 9, 2020. Shelby filed her motion to alter or amend alleging judicial bias on November 4, 2020. Thus, despite having three months to move for recusal and file an affidavit under K.S.A. 20-311d, Shelby instead lodged her allegations against the district judge in her motion to alter or amend without following proper statutory procedure. Shelby does not point to any extenuating circumstances— such as a last-minute disclosure by the district court as in *Alderson*—that would justify appellate review despite her failure to comply with procedure. See *Alderson*, 260 Kan. at 453-54.

Although some panels of our court may have considered these claims even in the absence of compliance with K.S.A. 20-311d, we are duty-bound to follow Kansas Supreme Court precedent unless there is some indication that the Court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). Given our Supreme Court has more recently decided this issue contrary to Shelby's position, without any indication of departing from that position, we must necessarily deny Shelby's judicial bias claim due to her failure to file a motion to recuse, an affidavit, or otherwise comply with K.S.A. 20-311d. See *Moyer*, 306 Kan. at 372. Parenthetically, we note also that Shelby's allegations of bias arise from the adverse rulings of the district

court. But our Supreme Court has held that adverse rulings of the district court, even if "numerous and erroneous, where they are subject to [appellate] review, are not ordinarily and alone sufficient to show bias or prejudice" enough to warrant disqualification. *Hulme v. Woleslagel*, 208 Kan. 385, 397, 493 P.2d 541 (1972).

We also decline to consider Shelby's judicial bias claims she raises for the first time on appeal under the Due Process Clause of the United States Constitution because this claim is not preserved for appellate review. Although Shelby raised claims of judicial bias in her motion to alter or amend, she is raising this constitutional challenge for the first time on appeal. It is well established that constitutional grounds for reversal asserted for the first time on appeal are not properly before us. *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 729, 317 P.3d 70 (2014). Although we acknowledge there are exceptions to this rule, Shelby does not explain why the issue should be considered despite raising it for the first time on appeal. See *In re Estate of Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284 (2008) (delineating exceptions to general rule against raising new issues for the first time on appeal); Supreme Court Rule 6.02(a)(5) (2022 Kan. S. Ct. R. at 35) (requiring appellants to explain why issue not raised below should be considered for first time on appeal). Our Supreme Court has warned that Rule 6.02(a)(5) would be strictly enforced, and litigants who failed to comply with this rule risked a ruling that the issue is improperly briefed and will be deemed waived or abandoned. *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014); see *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018) (party's failure to explain why unpreserved issue should be reviewed on appeal is fatal).

II.     DID THE DISTRICT COURT ABUSE ITS DISCRETION IN ITS JUDGMENT AND DECREE OF DIVORCE?

On appeal, Shelby makes multiple challenges to the district court's judgment and decree of divorce. Shelby's principal complaints with the district court's ruling rest on

arguments that insufficient evidence supports the district court's factual findings and orders.

When a district court's decision is challenged for insufficiency of the evidence or as being contrary to the evidence, we apply a substantial competent evidence standard. "'Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion.' [Citation omitted.]" *Gannon v. State*, 298 Kan. 1107, 1175, 319 P.3d 1196 (2014). In making this inquiry, we "should not reweigh the evidence or pass on the credibility of witnesses. Rather, [we] should review the facts of the case in the light most favorable to the prevailing party below to ascertain whether the trial court's decision is properly supported by substantial competent evidence." *In re J.M.D.*, 293 Kan. 153, 171, 260 P.3d 1196 (2011).

### A. *Shelby's annual income*

First, Shelby argues that the district court erred in calculating her annual income, which resulted in erroneous child support and spousal maintenance awards.

An award of spousal maintenance is governed by K.S.A. 2020 Supp. 23-2901 et seq. We generally review a district court's maintenance award for abuse of discretion. *In re Marriage of Vandenberg*, 43 Kan. App. 2d 697, 706, 229 P.3d 1187 (2010). A judicial action constitutes an abuse of discretion if (1) no reasonable person would agree with the district court's judgment; (2) it is based on an error of law; "or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based." *In re Marriage of Traster*, 301 Kan. 88, 109, 339 P.3d 778 (2014). The party asserting an abuse of discretion bears the burden of proving the same. See *Vandenberg,* 43 Kan. App. 2d at 701 (citing *Harsch v. Miller,* 288 Kan. 280, 293, 200 P.3d 467 [2009]).

8

Parental child support obligations in a divorce action are governed by statute and guidelines established by our Supreme Court. See generally K.S.A. 2020 Supp. 23-3001 et seq. (governing court's obligation and authority to make provisions for child support); K.S.A. 2020 Supp. 20-165 (mandating Supreme Court to adopt rules establishing child support guidelines); Kansas Child Support Guidelines (2022 Kan. S. Ct. R.at 101). The applicable standard of review depends on the question presented.

A district court's child support award is generally reviewed for abuse of discretion. But the interpretation of the Kansas Child Support Guidelines (Guidelines) is a question of law subject to unlimited review. *In re Marriage of Skoczek*, 51 Kan. App. 2d 606, 607, 351 P.3d 1287 (2015).

The district court found Shelby's annual income was $247,500, and it affirmed this determination upon Shelby's motion to alter or amend. At the hearing on Shelby's motion, the district court stated:

> "There is an assertion that—that Shelby's income should be [$]210,000, what she testified to. I believe the Court ordered that it should be [$]247,500.
> "And, I'm going to find explicitly that that's what the evidence supports. That was what she included in her Pretrial Conference Order. There was some testimony that during COVID . . . she didn't meet her goals. But, there is also testimony by her supervisor that they changed the goals to compensate some for that.
> "So, it's purely speculative whether she's going to meet that, or not.
> "I believe the testimony indicated that last year she was on—she was on target. And, so, I believe that is—the evidence does support the finding that her . . . yearly income should be considered to be [$]247,500."

On appeal, Shelby contends there was no evidence to support the district court's finding that Shelby was going to make $247,500 in 2020. She argues "the evidence showed that Shelby's income for 2020 would be in the range of $200,000 and $210,000.

It was error for the district court to make its own, unsubstantiated guesstimate of what Shelby's income for 2020 might be." Shelby correctly points out that she testified her income for 2020 would depend on how the pandemic impacted her sales, and she "[o]ptimistically" opined her income would be between $200,000 and $210,000.

Contrary to her assertion, however, the district court's finding was neither unsubstantiated nor a guess. It was provided by Shelby's own testimony and evidence. As Macklin argues, the district court's income figure came directly from Shelby's domestic relations affidavit and child support worksheet filed prior to the pretrial conference. Moreover, as the district court found when ruling on Shelby's motion to alter or amend, the parties submitted an agreed final pretrial conference order that stated Shelby's gross monthly income was estimated to be $20,625. The annual equivalent of this figure is $247,500—consistent with the district court's finding. Shelby did not amend these documents prior to trial, and she testified $247,500 was her "contracted targeted total income."

On appeal, Shelby also argues the $247,500 figure "was only for application if she had received primary residential custody because she was willing to waive any child support obligation of Macklin." But Shelby used this figure for the proposed worksheets she submitted contemplating both primary residential custody and shared residential custody. In short, Shelby's estimated income of $247,500 was provided by Shelby in the agreed pretrial order, her domestic relations affidavit, and her proposed child support worksheets for both residential custody options. The only evidence supporting Shelby's lower proposed $200-210,000 figure was Shelby's own testimony.

Shelby is improperly asking us to reweigh the evidence and pass on her credibility as a witness. This we cannot do. We find the district court's income finding is supported by the evidence.

B.     *Macklin's annual income*

Next, Shelby argues the district court made errors of fact when it calculated Macklin's income and, therefore, erroneously calculated the child support and spousal maintenance orders. Specifically, Shelby first argues the district court made an error of fact by finding depreciation of the outfitting business' hunting lodge was necessary to calculating Macklin's income. Second, she argues the district court made an error of fact by excluding the agricultural program and disaster payments from Macklin's income.

As part of the outfitting business owned by the parties, the "lodge" was used as lodging for hunters. The outfitting business also served meals at the lodge. If a hunt was booked with the outfitter, the hunters got to use the lodge. There was also testimony the lodge was rented to others as well. Prior to trial, the parties agreed Macklin would continue owning and operating the business. At the time of trial, Macklin testified he was living in the lodge. He also testified the outfitting business paid the mortgage, but he paid the utilities.

The district court's initial findings on this point were sparse. After some back and forth from the parties, the district court found depreciation of the lodge was necessary for the generation of income. When ruling on Shelby's motion to alter or amend, the district court expanded on that finding:

> "I do find that the depreciation was reasonably necessary to the production of income in this case. There was lots of testimony about the lodge being right next to where the hunting goes on, and it being part of the whole experience of the lodgers being there, the sharing food together, being a large part of that experience, as well as proximity, and it is necessary to production of income for Hang 'Em Outfitters.
> And, so, it should be depreciated, and depreciation should be allowed. And, I will find that it's a reasonable business expense in this context to deduct the depreciation from the income of Hang 'Em Outfitters."

11

On appeal, Shelby contends the district court made an error of fact when it speculated that depreciation was necessary to the production of the outfitting business' income. In addition to arguing Macklin did not present evidence that depreciation was necessary, Shelby takes issue with the district court's silence as to which accounting method was used to calculate the depreciation.

Under the Guidelines, domestic gross income for self-employed persons "is self-employment gross income less reasonable business expenses."  Kansas Child Support Guidelines § II.E.3. (2022 Kan. S. Ct. R. at 104). The Guidelines define "Self-Employment Gross Income" as "income from self-employment and all other income including that which is regularly and periodically received from any source excluding public assistance . . . ." Kansas Child Support Guidelines § II.E.1. (2022 Kan. S. Ct. R. at 104). And the Guidelines define "Reasonable Business Expenses" as "actual expenditures reasonably necessary for the production of income." Kansas Child Support Guidelines § II.E.2. (2022 Kan. S. Ct. R. at 104). The definition of reasonable business expenses clarifies that "[d]epreciation shall be included only if it is shown that it is reasonably necessary for the production of income." Kansas Child Support Guidelines § II.E.2. (2022 Kan. S. Ct. R. at 104).

Our court has previously held that "the guidelines leave room for judicial discretion in determining whether depreciation should be deducted as a reasonable business expense." *In re Marriage of Cox*, 36 Kan. App. 2d 550, 554, 143 P.3d 677 (2006). "The use of depreciation, if any, [for child support purposes] should depend on the particular circumstances of each case. . . . [T]he method in which a trial court chooses to calculate depreciation lies within its discretion." *In re Marriage of Wiese*, 41 Kan. App. 2d 553, 560, 203 P.3d 59 (2009).

Shelby's argument primarily suggests the district court's depreciation finding was unsupported by sufficient evidence because Macklin did not specifically testify

12

depreciation was reasonably necessary for the production of income. We disagree. When the evidence is viewed in the light most favorable to Macklin, it supports the district court's finding that depreciation of the lodge was reasonably necessary to the production of income.

The district court found the lodge was a large part of the hunter's experience when utilizing the outfitting business. Testimony from Sami Jantz—a family friend who also worked for Hang 'Em Outfitters—supported this finding; she stated she cooked meals for the hunters at the lodge and the outfitter used the lodge to plan the guided hunts. During his testimony, Macklin confirmed the lodge sat on property in close proximity to where he takes clients hunting.

Shelby's counsel questioned Macklin about including depreciation of the lodge on his tax returns, but he could not provide much feedback. On cross-examination, the following colloquy occurred:

> "[SHELBY'S COUNSEL:] So, then, we turn over to 2018, you have $6,278.00 in mortgage payments; is that correct?
> "[MACKLIN:] Yes.
> "[SHELBY'S COUNSEL:] So, that would have been a full year, full use of the lodge; correct?
> "[MACKLIN:] Right.
> "[SHELBY'S COUNSEL:] And, you include depreciation on this of $3,093.00; isn't that true?
> "[MACKLIN:] Okay.
> "[SHELBY'S COUNSEL:] And that—is that true?
> "[MACKLIN:] Yeah, it's written on there.
> "[SHELBY'S COUNSEL:] Okay. And, that depreciation is associated with the lodge; is that correct?
> "[MACKLIN:] I give my documents to an accountant. I'm not an accountant. So, I'm going to assume yes.

"[SHELBY'S COUNSEL:]  Okay. If I represent to you that there is a depreciation schedule in his tax return that says this is solely attributable to the lodge, do you have any reason to dispute that?

"[MACKLIN:]  No."

After quoting the foregoing colloquy in her brief, Shelby argues:  "As such, the district court had no evidence that the depreciation was a necessary business expense nor did the court have any information regarding that depreciation was necessary for the generation of income." While Shelby is correct that there was no direct testimony by Macklin that depreciation was reasonably necessary, there was evidence to support the district court's findings that the lodge was central to the outfitting business.

Admittedly, there is not much evidence in the record addressing Macklin's and the outfitting business' financial situation apart from the parties' joint income tax returns and an exhibit detailing Hang 'Em Outfitters' profits and losses from 2012 to 2019. And other panels of our court have found "the taxable income shown in a tax return is not always a reliable indication of domestic gross income." *In re Marriage of Lewallen*, 21 Kan. App. 2d 73, 75, 895 P.2d 1265 (1995). Nevertheless, the *Lewallen* panel found that "a total disregard of depreciation in farming operations is an abuse of discretion by a court." 21 Kan. App. 2d at 75.

Given the parameters set by the Guidelines and subsequent caselaw, whether the district court abused its discretion in including depreciation as a reasonable business expense is a close call. Although the *Lewallen* panel found income tax returns do not always provide "a reliable indication of domestic gross income," 21 Kan. App. 2d at 75, Shelby has not argued it would be an error for the district court to have considered this evidence in coming to a conclusion. In fact, she does not point to any specific errors of fact—despite alleging the district court made such error. As in her motion to alter or amend, Shelby's argument on appeal simply seems to claim the district court made a

14

factual error by disagreeing with her position, which is not enough to establish an error of fact by the district court. See *RAMA Operating Co. v. Barker,* 47 Kan. App. 2d 1020, 1036, 286 P.3d 1138 (2012) (holding conclusory arguments raised in brief and not argued or supported therein are deemed abandoned on appeal). Moreover, our court has stated that we will only reverse a district court's ruling on child support—including whether depreciation is applicable to determining income—if no reasonable person would agree with the district court. See *Cox*, 36 Kan. App. 2d at 554. We cannot make such a finding under these facts.

Upon reviewing the evidence in the light most favorable to Macklin, it does not seem unreasonable that the district court would conclude that applying depreciation was appropriate. As noted, sufficient evidence supports the finding that the lodge is central to the outfitter's business—providing lodging and meals for hunters employing the outfitter. And the parties' joint tax returns for 2017, 2018, and 2019 show a federal depreciation schedule for the hunting lodge that indicated the parties deducted $3,093 each year in depreciation on the lodge from their taxable income. Moreover, Macklin provided details of profits and losses for Hang 'Em Outfitters, and that exhibit suggested the financial state of the outfitter fluctuated. The district court found the exhibit was "the best valuation" it had. Although the outfitter averaged $624.38 in profit over seven years, the exhibit suggested the outfitter did not consistently bring in a profit. In 2017, Hang 'Em Outfitters had profits of $6,374, but it lost $4,223 in 2018. In 2019, the outfitter reported a profit of $3,050.

Given our standard of review, Shelby has not met her burden of showing the district court made an error of fact or abused its discretion by including depreciation in its calculation of Macklin's income.

C.    *Exclusion of agricultural program and disaster payments from Macklin's income*

Shelby also argues the district court abused its discretion when it refused to include certain Farm Service Agency (FSA) payments as part of Macklin's annual income. In response, Macklin argues the payments were properly excluded from his income under the Guidelines because they are a form of public assistance, the payments are made payable to Macklin's father, and any error was harmless because Macklin's income from farming is a net loss.

Under the Guidelines, income is defined as:

"The domestic gross income for the wage earner is income from all sources, including that which is regularly or periodically received, excluding public assistance and child support received for other children in the residency of either parent. For the purposes of these guidelines, the term 'public assistance' means all income, whether in case or in-kind, which is received from public sources and for which the recipient is eligible on the basis of financial need." Kansas Child Support Guidelines § II.D. (2022 Kan. S. Ct. R. at 103).

Relying on the "from all sources" language, Shelby contends the district court erred when it refused to include the payments Macklin received from the FSA to determine his annual income. Shelby contends this was an error because although the payments were payable to Macklin's father, Macklin received the funds, Macklin's father did not require him to pay the funds back, and Macklin included the funds in his 2019 tax return.

But, as Macklin suggests, any error by the district court on this issue was harmless. An error is harmless when the error "did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome." *State v. Ward*, 292 Kan. 541,

16

565, 256 P.3d 801 (2011). Where an error implicates a statutory but not a federal constitutional right, the party benefiting from the error must persuade the court that there is no reasonable probability that the error affected the trial's outcome in light of the entire record for it to be deemed harmless. *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012).

Macklin did not include any income from farming operations on his domestic relations affidavit based on the average income generated by farming operations from 2015 to 2019. Employing a grid detailing the profits and losses from farming, Macklin showed that even if he included the FSA funds in his income to determine a profit or loss on the farming operations, the average farming operations still averaged at a loss. Relevant to Shelby's challenge, Macklin's net profit or loss from farming operations is detailed in the parties' joint tax returns. It appears Macklin received "[a]gricultural program payments" in 2018 and 2019, and these payments were used to calculate Macklin's net profit from farming operations. The following table details the net profit or loss reported on the tax returns and the amount of agricultural program payments Macklin received:

| Tax year | Net Profit or Loss from Farming | Agricultural Program Payments |
|---|---|---|
| 2012-2014 | No farming operations | Not applicable |
| 2015 | ($7,295) | None |
| 2016 | ($8,997) | None |
| 2017 | $2,894 | None |
| 2018 | $4,536 | $5,534 |
| 2019 | $4,850 | $4,556 |
| Five-year average | ($802.40) | |

As the table shows, Macklin averaged a loss of $802.40 over the five-year period he accounted for farming operations in the parties' joint tax return. Absent the agricultural program payments, Macklin's average loss would be considerably greater. And as

17

Macklin notes, Shelby neither challenged the use of the average for farming operations at the trial court nor on appeal.

In her motion to alter or amend, Shelby did challenge the district court's use of an eight-year average to determine the outfitter's earnings, arguing only years 2017, 2018, and 2019 should be considered to compute an average. The district court agreed, and it used the three years' income values for the outfitter, including depreciation, to compute an average to determine Macklin's annual income. But despite challenging the use of an average for the outfitter's valuation, Shelby did not challenge the use of an average to determine Macklin's income based on farming operations. It also does not appear she challenged Macklin's refusal to include any farming income in his domestic relations affidavit.

Rather, Shelby solely requested the district court include Macklin's 2019 farming profit in calculating his child support income. In her motion to alter or amend, she argued: "In summary, Macklin's child support income should include $47,376 for employment wages and $4,804 [the three-year average] from Hang 'Em Outfitters and $4,850 *from farm profit for self-employment wages.*" (Emphasis added.) On appeal, however, Shelby's argument has morphed into solely requesting the program payments to be included in Macklin's income, and she does not specify if she is requesting just the amount paid pursuant to the program ($4,556) or the total net profit amount listed in the 2019 tax return ($4,850). To this extent, Shelby may be improperly raising a new legal theory for the first time on appeal, and she has failed to designate a record sufficient to present her point and establish her claim. See *Gannon*, 303 Kan. at 733 (finding issues not raised before district court cannot be raised on appeal); *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644, 294 P.3d 287 (2013) (finding party claiming error has burden to designate record).

Shelby's argument in her motion to alter or amend suggested she intended for the profits from farming operations—not just potential income from the agricultural program payments—to be considered in calculating Macklin's child support income. But, as shown, Macklin's average income from farming operations is a loss even when the agricultural program payments are included for consideration. Because Macklin's net income from farming operations—including the challenged agricultural program payments—averaged at a loss, any error by the district court was harmless.

Because the district court's determination of the parties' incomes was supported by the evidence, Shelby has failed to persuade us that the district court abused its discretion with its child support and spousal maintenance awards.

D.    *Valuation of the marital residence*

Next, Shelby argues the district court abused its discretion in its valuation of the marital residence because it made "unsupported, arbitrary and speculative findings related to testimony of Nancy Milford." Macklin argues the district court's concerns about Milford were supported by the evidence and it was proper for the district court to rely on common knowledge and experience to determine Milford's credibility.

Like child custody and spousal maintenance, a district court's property division in a divorce action is reviewed for an abuse of discretion. See *In re Marriage of Wherrell*, 274 Kan. 984, 986, 58 P.3d 734 (2002).

Milford was the certified appraiser who appraised the value of the marital residence. As noted, the district court had multiple issues with Milford's appraisal, and it determined her testimony regarding the valuation of the marital home was not credible. Shelby challenged these findings in her motion to alter or amend, but the district court affirmed its findings.

Shelby's arguments on appeal effectively ask us to reweigh the evidence and pass on the credibility of Milford. Shelby made the same arguments, based on the same facts, in her motion to alter or amend, and the district court was not persuaded. We conclude sufficient evidence supports the findings that Shelby challenges on appeal.

First, Shelby challenges the district court's finding that a septic tank was not located on the property. But Milford testified twice that the septic tank did not appear to be on the property. Upon reviewing an aerial photograph of the property—which was included in her appraisal—Milford testified the aerial photograph "does look like a septic system is not on the two acres." And Milford conceded that "without an actual survey being done," she could not determine whether the septic system was located within property boundaries. On cross-examination, Milford testified to where she believed the septic system was located and conceded that even if the boundary lines of the marital property were extended to the roads, the septic system looked like it was not located within the property boundaries. Macklin testified he was "100 percent sure [the septic system was] off the property." The record contains sufficient evidence to support the district court's finding that the septic system was not located on the property.

Second, Shelby argues the district court erred when it took issue with the comparable homes Milford used for her valuation. In its initial ruling, the district court found: "I do have quite a few problems with [Milford's] testimony. Using properties that aren't really close or—or alike in the sense that not nearly as far out in the country are definitely, I think, reason to question her valuation." Shelby briefly challenges this finding by arguing the district court ignored Milford's testimony that a rural adjustment was unnecessary.

But the district court specifically found Milford's credibility regarding her valuation of the rural property should be questioned. As we cannot pass on the credibility of witnesses, it would be improper us to find the district court should have considered this

20

testimony. "[A] district court's ability to observe witnesses and . . . to assess detachment, objectivity, and professionalism, is one of the reasons that appellate courts defer to the trial court's factual findings and witness credibility assessments." *Cresto v. Cresto*, 302 Kan. 820, 839, 358 P.3d 831 (2015).

Third, Shelby challenges the district court's finding regarding the right of first refusal to Macklin's parents on the warranty deed to the property. As Macklin points out, Shelby's argument seems to allude that Milford testified the right of first refusal would not affect the value of the property—but this is a misstatement of the testimony. To the contrary, at trial, Milford was asked, "If there was a right of first refusal to purchase the property by the individuals who owned the land where the septic system was laying, . . . would it maintain the value?" Milford responded, "It would maintain the value."

In its ruling, the district court found: "Common knowledge and experience says that the right of first refusal is going to turn away bidders. There is going to be some that don't want to bid on that just to establish a price and no—have no real chance of it." Shelby argues this finding was "purely speculative by the district court and was a finding not based on the evidence presented at trial."

While district judges may not use their personal experience to decide an issue at trial without hearing evidence, "a trial judge is allowed to use his or her *common knowledge and experience* to determine the credibility of a witness and assess the weight of a witness' testimony." *State v. Dority*, 50 Kan. App. 2d 336, 343, 324 P.3d 1146 (2014). In *Dority*, the panel affirmed the trial judge's guilty verdicts when the trial judge "merely noted" the similarity in the case to previous domestic battery cases he had encountered and "indicated that he was not basing his guilty verdicts solely on his common knowledge and experience about domestic violence victims." 50 Kan. App. 2d at 343. The district judge in *Dority* discussed the physical evidence and the victim's

written statement. The *Dority* panel found the defendant received a fair trial because the district judge considered all the evidence. 50 Kan. App. 2d at 344.

Here, the district judge specifically stated he disagreed with Milford based on the judge's common knowledge and experience. The district judge did not rely on any specialized experience to value the marital residence; rather, he relied on his common knowledge and experience to assess Milford's credibility and determined she over-valued the residence. Moreover, Shelby does not advance any argument as to why the district judge's reliance on his own common knowledge and experience was error other than to suggest the district court ignored Milford's testimony.

We conclude the district court did not make any errors of fact in its valuation of the marital residence.

E. *Sexual abuse allegations*

In her next allegation of error, Shelby contends the district court made an error of fact when it found no sexual abuse occurred in the relationship. As a result, Shelby claims the district court abused its discretion when it did not consider sexual abuse in assessing custody and parenting time. Macklin responds that Shelby is improperly reweighing the evidence and reassessing the credibility of witnesses and she ignores the important distinction the district court made when making its findings on Shelby's sexual abuse claims. Although Shelby frames this issue as an abuse of discretion, the crux of her argument challenges the sufficiency of the evidence supporting the district court's finding.

The district court made a distinction between sexual abuse and what the district judge called "sexual disrespect." In the district court's initial ruling, it found:

"There was disrespect, no question about that. Macklin admits to disrespect. There was definitely—he learned a lot, that he needs to respect women more. He—he needs to know that even within a marriage no means no.

"But, I also know that—I believe and find that Shelby leveraged this. She leveraged it for her benefit. That's part of her nature. She's good at that. And, that's something she could leverage.

"And so, but, because of that, it's—it decreases her credibility as a witness for this type of case. It increases her abilities as a sales person, but not so much as a witness when the evidence doesn't support that."

Shelby challenged this ruling in her motion to alter or amend, arguing the finding was contrary to the evidence she presented. At the hearing, the district court noted it gave the issue close attention:

"This one gave me a lot of pause and—and I had to really—I looked at a lot of things to review, and also my own reaction to it. I must admit that I—I did react to it, and I was shocked by the—the tenor of the argument, because I have been very passionate in my career, before coming on as a judge, in finding sexual abuse and in standing up for victims.

"And, so, that—I had to be careful not to allow that to affect me personally. So, that's why I took extra time, I believe, in reviewing the evidence. And—and, after reviewing that—everything, I believe that my findings—there is substantial evidence to support the findings that I did make, and I will go down those."

The district court went on to find there was no evidence or testimony from the therapists, or Shelby, suggesting "there was ever any forced sex or sex against consent, or anything like that." The district court made a distinction between the evidence supporting sexual disrespect, but not sexual abuse:

"The evidence of the—offered from the therapists were not findings of sexual abuse. I don't know that they didn't testify, they were just—the way that they were

23

framed. I don't know that—what the basis of that was, if there was ever any forced sex or sex against consent, or anything like that. There was never any testimony of that.

"And, just summarizing it as sexual abuse could be, as we found later, that there certainly was disrespect. A layman could certainly summarize disrespect, sexual disrespect, as sexual abuse. And, so, I don't find that that necessarily supports sexual abuse.

"Also, Shelby didn't directly testify to any sexual abuse.

"The letters [from Macklin] themselves, I found and I do find, that they more relate to sexual disrespect, that he kept asking—I took it more as he kept asking for sex, he kept persisting and not respecting her no. Not that against her will he forced her to have sex, or in any way over—overcame her by fear or any other thing like that that would—would move it in the realm of sexual abuse of some kind.

"And, I definitely don't find there is any evidence that there was a rape as is now alleged in—or, as Shelby alleges in her motion."

On appeal, Shelby points to the records of three therapists that were admitted at trial. But, again, she reiterates the same evidence the district court found did not support sexual abuse by Macklin. Notably, the district court addressed the exact evidence Shelby is asking us to reweigh on appeal:

"Basically, my first comments about the therapists, Whitney Mosier and Michelle [Oliphant] also apply to them. I do acknowledge that—that Ms. Mosier's report indicates that the female partner reported that sexual dyn—sexual relation dynamic was a primary source of conflict in the relationship, and the male client states that he continues to push female to have sex—sexual contact even after she repeatedly denies.

"The male client stated that he recognizes this is a problem.

. . . .

"And, the same thing, Michelle Oliphant used the sexual assault language. And, her notes reflect that Shelby believes Macklin lacks the ownership of the sexual issues of the marriage and says he—he thought that marriage meant consent. No isn't no.

"Again, that goes back to my conclusions that he kept asking for sex, not respecting her no, and that was a major problem in their marriage.

"But, again, no evidence that—of forced sex or what I would call—what I would find as sexual abuse in—in their marriage."

A full reading of the district court's lengthy comments and findings about this issue suggests the district court reviewed the evidence but only gave the therapist records weight to support its sexual disrespect finding. The district court also found Shelby's testimony on this issue was not credible.

The letter referenced by the district court, and upon which Shelby relies, supports the district court's finding that Macklin pushed Shelby for sex, that Macklin recognized this was a problem, but that Macklin's actions never rose to sexual abuse. Although Macklin alluded to issues of consent, the letter does not provide evidence of sexual abuse. Shelby read this portion into the record during her testimony: "I know that I had a selfish agenda with sex in our relationship, I thought for far too long that you were my wife so that meant consent. Which is [so] far from the truth that [it's] not even funny." Shelby also read into the record a text she received from Macklin during her testimony. It stated in part: "I understand Shelby. I'm so sorry for things from the past and my selfish actions. I've never wanted to hurt you on purpose, I fully realize I that I was pursuing physical intimacy with you in a selfish and wrong way."

As the district court noted, the session notes of Mosier, the couple's therapist, show Macklin stated he continued to push for sex after Shelby repeatedly denied, and he recognized this problem. The court found Mosier's note showed Macklin "would continue to push for sex, but not that he overcame her with force or fear and—and abused her . . . to have sex, or against her consent."

A session note of Irma Jeffries, Shelby's individual therapist, stated a goal of the session was "[s]exual abuse processing." Shelby emphasizes this point to us but ignores the fact that the same note indicated she reported disrespect with no further evidence of

25

sexual abuse. Apart from the therapist's notes indicating that a goal of the therapy was "sexual abuse processing," the notes do not otherwise mention sexual abuse. This evidence supports the district court's findings that Shelby did not suffer from sexual abuse.

Shelby also relies heavily on the session notes of Macklin's individual therapist, Oliphant, who later became the couple's therapist. She believes Oliphant's records are contrary to the district court's findings and support a finding that "Macklin's own therapist found that he was a sexual abuser."

But the district court disagreed with this interpretation of Oliphant's session notes. The district court found Oliphant's notes supported the conclusion that Macklin "kept asking for sex, not respecting [Shelby's] no," but Oliphant's records did not show evidence "of forced sex or what I would call—what I would find as sexual abuse in—in their marriage." Our review of Oliphant's notes supports this finding. While Oliphant does use the terms "sexual abuse" or "sexually aggressive" on occasion in her notes, when the notes are viewed in the light most favorable to Macklin, they support the district court's conclusion that the terms did not necessarily mean there was evidence of sexual abuse in the relationship. Oliphant's records support the district court's conclusion that her notes did not provide evidence of sexual abuse in the marriage, but the notes did provide evidence of what the district court referred to as sexual disrespect.

Oliphant's notes also support the district court's finding that Shelby leveraged this alleged sexual abuse against Macklin in an attempt to gain custody of the children. Oliphant's handwritten session notes from June 3, 2019, and June 17, 2019, both indicated Shelby had threatened to tell the judge about sexual assault and Macklin was afraid of losing custody of his girls. Her progress notes from August 28, 2019, stated: "[Macklin] maintains he wants 50/50 custody and [is] afraid [Shelby] will blackmail him into gaining full custody." After her records were subpoenaed, Oliphant's progress note

26

indicated Macklin told her that Shelby was "being very manipulative and trying to use anything to get full custody" and "[Macklin] worries about [Shelby] lying and using their sexual issues as a weapon against him."

Given the evidence supporting the district court's findings on Shelby's allegations of sexual abuse, we will not disturb them on appeal. As Shelby does not argue the district court's findings on this point constitute an error of law or were otherwise unreasonable, she fails to establish that the district court abused its discretion when considering her claims of sexual abuse in assessing custody and parenting time.

F.      *Credibility of Shelby's witnesses*

Next, Shelby appears to challenge the district court's credibility determination regarding four witnesses and herself.

The judge is the finder of fact in a bench trial. *State v. Pratt*, 255 Kan. 767, 769, 876 P.2d 1390 (1994); see *Dority*, 50 Kan. App. 2d 336, Syl. ¶ 3. "It is the factfinder's function to determine the weight and credibility of the witnesses." *In re Estate of Farr*, 274 Kan. 54, 68, 49 P.3d 415 (2002). And to reiterate, we do not reweigh the evidence or pass on the credibility of the witnesses. *Wolfe Electric, Inc.*, 293 Kan. at 407. "[A]ppellate courts will not overturn a trial court's weighing of the evidence or assessment of witness credibility from a cold record." *State v. Schaefer*, 305 Kan. 581, 595, 385 P.3d 918 (2016). "One of the reasons that appellate courts do not assess witness credibility from the cold record is that the ability to observe the declarant is an important factor in determining whether he or she is being truthful." *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008).

In refusing to consider a claim challenging witness credibility following a bench trial, another panel of our court explained the purpose of the general rule against reassessing witness credibility determinations:

"This court has neither any reason nor any legal justification for quarreling with the credibility determinations. The district court observed the witnesses as they testified. That is a powerful tool in assessing credibility. Indeed, the judicial process treats an appearance on the witness stand, with the taking of an oath and the rigor of cross-examination, as perhaps the most discerning crucible for separating honesty and accuracy from mendacity and misstatement. *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008)." *In re Estate of Hutchings*, No. 107,132, 2012 WL 4795622, at *2 (Kan. App. 2012) (unpublished opinion).

Accordingly, we decline to reweigh the district court's credibility determinations of these witnesses.

G.      *Child custody and parenting time*

Next, Shelby challenges the district court's finding that the children were to remain residing in the Pratt area. Apart from attacking a few factual findings, Shelby seems to be arguing the district court's order shows the district judge was biased against her. She starts by arguing: "The real breakdown of bias came from the district court's odd idea of joint and shared custody." She goes on to challenge the district court's shared residency plan by suggesting the district court's child residency order prevented her from moving to Wichita, despite the district court permitting her to move there. She concludes, however, that the district court abused its discretion by "making orders that would only penalize Shelby and the children if enforced" and the district court made errors of fact and law that require remand for a new trial before a different judge.

To the extent Shelby is challenging the district judge as being biased, we decline to address those allegations for reasons we have already outlined.

The remainder of Shelby's argument is unclear because she seems confused by the district court's orders. The district court flatly refused to dictate where Shelby resided. After finding shared custody was in the best interests of the children, the district court held: "Shelby can move where she wants to move. If she believes that requires her to [move to] Wichita, that's okay. And, the parties are going to have to figure out how to do the transportation, as the children will—will be primarily in Pratt." At the hearing on Shelby's motion to alter or amend, the district court reiterated its ruling "allows her to live in Wichita if that's her choice."

Although the district court permitted Shelby to move to Wichita, the district court ordered the children to remain residing in the Pratt area, finding in its initial ruling that it was in the best interests of the children because that "is where they've lived most of their life and in that marital residence." To reach this conclusion, the district court addressed the child custody factors under K.S.A. 2020 Supp. 23-3203. The district court noted it created the two-week custody schedule "because of the distance" from Pratt to Wichita and to accommodate Shelby and her job. The district court believed this custody plan could be done without requiring Shelby to sacrifice her job and maintained it was in the best interests of the children because it decreased transitions and increased stability for the children.

The district court came to the same conclusion after considering Shelby's motion to alter or amend. When addressing the factor considering the location of the parties' residence and places of employment, the district judge opined:

29

"Again, Shelby's [residence], I presume from the trial testimony that it would probably be Wichita. But, I did not know for sure and didn't order it. And, so, was not sure whether it would be Wichita or Pratt. Those were the two that were talked about.

"But, either one of those, I believe, are going to be conducive to sharing parenting time with the two-week to two-week, and that neither—it does not argue that either place would necessarily be better.

"Although, that Macklin's [residence] is the home that [the children have] already—always known, and that is an important factor that continues to argue, at least, for shared parenting time for him.

"But, also, as I've noted, Shelby is a very important part for these girls in their lives, and she needs at least equal parenting time, as well."

Shelby interprets the district court's decision to mean she "cannot truly be involved in the decision about school or childcare" and the district court's residential orders make moving to Wichita "realistically impossible." We disagree.

A district court's discretionary determination of a child's custody, residency, visitation, or parenting time is guided by various provisions of K.S.A. 2020 Supp. 23-3201 et seq. The paramount consideration in making these decisions is the child's welfare and best interests. Given the district court's unique vantage point of what is often an emotionally charged situation, we generally will not overturn these decisions unless the district court abused its discretion. See *Cheney v. Poore*, 301 Kan. 120, 128, 339 P.3d 1220 (2014); see also *Frazier v. Goudschaal*, 296 Kan. 730, 755, 295 P.3d 542 (2013) (applying abuse of discretion review to coparenting agreement). Challenges to specific factual findings in support of these determinations are reviewed to assure that they are supported by substantial competent evidence and that the findings support the district court's legal conclusions. *Vandenberg*, 43 Kan. App. 2d at 704.

Although Shelby claims the district court made an error of law, she does not argue an error of law in her analysis. Most of the facts Shelby challenges are misinterpretations

30

of the district court's orders. Apart from the bias challenges, Shelby's arguments seem to challenge the sufficiency of the evidence, in addition to arguing the district court's custody order was arbitrary, fanciful, or unreasonable. But the district court made extensive findings under most of the factors listed for consideration to determine custody under K.S.A. 2020 Supp. 23-3203(a).

Shelby starts by arguing "the evidence showed she must" live in Wichita. The district court's order flatly contradicts that claim. Next, she argues the district court's orders effectively limited her say in which doctors the children see, where they go to school, and daycare options. This is a misinterpretation of the district court's custody order. The district court ordered Shelby and Macklin to equally weigh in on such matters, each subject to the geographical limitation. But the district court also noted exceptions for matters such as specialized medical care. Shelby also briefly argues the district court limited her decision making regarding emergencies based on some out of context statements by the district court. But the parties' parenting plan addresses emergency decision making: "The party having the actual physical custody of the minor children at any particular time shall have the authority to consent to any medical or dental emergencies."

Shelby goes on to argue it could not be in the best interests of the children "to have to travel three hours a day for daycare and school" and suggests "[t]his is all just a ploy by the district court to thwart Shelby's plans to move to Wichita." But the district court specifically created the two-week custody schedule in an attempt accommodate, not thwart, Shelby's relocation plans.

Finally, Shelby has not shown the district court's custody order was arbitrary, fanciful, or unreasonable. Given the relocation requirement was a significant issue at the trial, it was not unreasonable for the district court to refuse to require Shelby reside in any certain location. It was also not unreasonable to create the two-week schedule for the

same reason. The district court was simply attempting to create an option for Shelby to move to Wichita, if she wished. Shelby has not presented any evidence or legal argument that would suggest the district court's decision was unreasonable, and therefore she has not met her burden of showing the district court abused its discretion with its custody and parenting time order.

H.    *Equalization payment*

In her last claim, Shelby argues the district court abused its discretion concerning whether the parties had agreed to no equalization payment. She uses the district court's findings on this point to assert her judicial bias claims once again.

The record shows the district court did not order an equalization payment. In its initial ruling, the district court opined that it forgot about an equalization payment and asked the parties for comment. The following occurred:

> "[SHELBY'S COUNSEL:] Yeah. It was my understanding that since we're going on Macklin's testimony, Macklin's testified at trial that he wasn't asking for an equalization payment.
> "[MACKLIN'S COUNSEL:] We would be fine if that waiver goes both ways. If we just agree to do a division with no equalization, we can agree to that.
> "THE COURT: It's agreed to. That's what I like.
> . . . .
> "Anything else need clarified?
> "[MACKLIN'S COUNSEL:] Nothing by the Respondent."

On appeal, Shelby relies on this colloquy to argue: "It's agreed to? How? Because Shelby's counsel didn't respond? How does that work? It goes against the testimony presented by Shelby. It was a completely self-serving finding by the district court that showed once again what the court thought of Shelby and her counsel."

32

Apart from assisting in her bias claim, it is unclear how Shelby believes the district court erred here. A full reading of the transcript suggests Shelby did not object to this finding, and she never argues the district court refused her an opportunity to object. Moreover, the district court gave her attorney an opportunity to respond, and counsel did. The district court relied on this response to come to a decision. Shelby's attorney simply did not pose any argument suggesting the district court should order an equalization payment.

Shelby also did not address the issue in her motion to alter or amend, despite challenging nearly all the district court's orders and findings. Like in her argument on appeal, Shelby briefly argued the district court's "acceptance of an agreement regarding waiver of an equalization payment even though no agreement was made" showed the district court was biased against her. The district court, similarly, did not address the equalization payment at the motion hearing—most likely because Shelby did not challenge it in her motion.

To the extent Shelby is appealing the equalization payment as being unsupported by sufficient evidence, we conclude this argument has not been preserved. Shelby has not shown the district court's action of refusing to order an equalization payment was an abuse of discretion.

CONCLUSION

In conclusion, our extensive review of the record on appeal has not revealed any reversible error on the part of the district court. We decline to address Shelby's claims of judicial bias because she failed to follow the proper statutory procedure below and raises her constitutional claim only for the first time on appeal without explaining why we should review it. We find substantial competent evidence supports the district court's conclusions regarding the hotly contested issues brought before it—determination of the

parties' incomes for the calculation of child support and spousal maintenance, valuation of the marital residence, and Shelby's allegations of sexual abuse in assessing child custody and parenting time. We also find that any error in the district court's calculation of Macklin's income was harmless. Finally, we find no abuse of discretion in the district court's resolution of the issues before it relating to property valuation and division, child custody and parenting time, and child support and spousal maintenance.

Affirmed.